65 F.3d 1502
 25 Envtl. L. Rep. 21,539, 95 Cal. Daily Op.
Serv. 7290,
95 Daily Journal D.A.R. 12,451
 SIERRA CLUB; Headwaters, Inc.; Forest Conservation
Council; and Oregon Natural Resources Council,
Plaintiffs-Appellees,
v.
Bruce BABBITT, Secretary, U.S. Department of Interior, Defendant,
and
Seneca Sawmill Company, an Oregon corporation,
Defendant-intervenor-Appellant.
SIERRA CLUB, Plaintiff-Appellee,
v.
Bruce BABBITT, Defendant-Appellant.
SIERRA CLUB, Plaintiff-Appellant,
v.
Bruce BABBITT, Defendant-Appellee,
and
Seneca Sawmill Company, an Oregon corporation,
Defendant-intervenor-Appellee.
 Nos. 93-35482, 93-35498 and 93-35509.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Jan. 13, 1995.
Decided Sept. 15, 1995.
 
 William H. Sherlock, Ashland, OR; and Gary K. Kahn, Reeves, Kahn & Eder, Portland, OR, for plaintiffs-appellees-cross-appellants.
 Peter A. Appel, United States Department of Justice, Washington, DC, for defendant-appellant-cross-appellee.
 Mark C. Rutzick, Portland, OR, for defendant-intervenor-appellant-appellee.
 Appeals from the United States District Court for the District of Oregon.
 Before: PREGERSON and TROTT, Circuit Judges, and FITZGERALD,* Senior District Judge.
 Opinion by Judge Trott; Dissent by Judge Pregerson.
 TROTT, Circuit Judge:
 
 OVERVIEW
 
 1
 Sierra Club and other environmental organizations filed suit against the Secretary of the Interior Bruce Babbitt ("Secretary") seeking to enjoin Seneca Sawmill Company's ("Seneca") construction of a logging road on right-of-way crossing Bureau of Land Management ("BLM") forestland. Sierra Club alleged the BLM failed to comply with the procedural commandments of the National Environmental Protection Act of 1969 ("NEPA"), 42 U.S.C. Sec. 4321 et seq. and the Endangered Species Act of 1973 ("ESA"), 16 U.S.C. Sec. 1531 et seq. before allowing Seneca to begin its road construction project. On cross-motions for summary judgment, the district court ruled in favor of the BLM and Seneca on Sierra Club's NEPA claim, but granted Sierra Club's motion on the ESA claim. The district court enjoined further right-of-away construction until either the BLM or Seneca complied with the ESA's requirements. All parties timely appealed. We have jurisdiction pursuant to 28 U.S.C. Sec. 1291, and we affirm in part, reverse in part, and remand.
 
 BACKGROUND
 A. The Statutory Framework
 1. The Endangered Species Act
 
 2
 In an effort to prevent the extinction of various fish, wildlife, and plant species, Congress in section 4 of the ESA, 16 U.S.C. Sec. 1533(a), directed the Secretary to list endangered and threatened species and to designate habitat critical to the survival of those species. Once a species has been afforded protection under section 4, federal agencies must comply with the procedural and substantive requirements contained in section 7 of the ESA, 16 U.S.C. Sec. 1536. The purpose of section 7 is to avoid agency activities that will unfavorably affect a listed species. Thus, a federal agency is prohibited from authorizing, funding, or carrying out any action that is likely to jeopardize the continued existence of a protected species or adversely modify its critical habitat. 16 U.S.C. Sec. 1536(a)(2). To accomplish the goal of this substantive requirement, section 7(a)(2) of the ESA imposes a procedural duty on federal agencies to consult with the U.S. Fish and Wildlife Service ("FWS")[1] before engaging in a discretionary action which may affect a protected species. 16 U.S.C. Sec. 1536(a)(2); 50 C.F.R. Sec. 402.14(a). The purpose of the consultation procedure is to allow the FWS to determine whether the federal action is likely to jeopardize the survival of a protected species or result in the destruction or adverse modification of its critical habitat and, if so, to identify reasonable and prudent alternatives which will avoid the action's unfavorable impacts. See 16 U.S.C. Sec. 1536(b)(3)(A).
 
 
 3
 Additional section 7 substantive duties require an agency actively to utilize its authority to conserve a listed species, 16 U.S.C. Sec. 1536(a)(1), and to avoid taking[2] a protected species except where the taking is incidental[3] to the action and the harm is minimal and unavoidable, 16 U.S.C. Sec. 1536(b)(4). Finally, the taking of a protected species by any person (including a federal agency) violates section 9 of the ESA, 16 U.S.C. Sec. 1538(a), unless that person is authorized to do so after section 7 consultation, 16 U.S.C. Sec. 1536(b)(4), or by a section 10(a) incidental take permit, 16 U.S.C. Sec. 1539(a).
 
 2. The National Environmental Policy Act
 
 4
 Congress, through NEPA, imposed procedural requirements on federal agencies designed to force an agency to consider the environmental consequences of its proposed activity. Thus, NEPA requires a federal agency to produce an environmental impact statement ("EIS") when proposing to engage in an action that will significantly affect the human environment. 42 U.S.C. Sec. 4332(2)(C). Usually, unless a proposed action falls within a categorical exclusion, or the proposal is one which normally requires an EIS, the agency will prepare an environmental assessment ("EA") to determine whether an EIS is necessary. 40 C.F.R. Sec. 1501.4. If an EA indicates a proposed action will significantly affect the human environment, an EIS is required. 42 U.S.C. Sec. 4332(2)(C). Otherwise, the agency may issue a finding of no significant impact ("FONSI") and then execute the action.
 
 B. Facts and Prior Proceedings
 
 5
 This suit involves BLM land that is part of a checkerboard pattern of alternating public and private forestland ownership. To facilitate federal access to the public lands, in 1895 Congress authorized the Secretary to enter into reciprocal right-of-way agreements with private property owners.[4] See 43 C.F.R. Secs. 2812.0-3, -6 (explaining current authorization and policy). Pursuant to this longstanding statutory authority, and before the enactment of the ESA and NEPA, the BLM entered into a reciprocal right-of-way agreement in 1962 with Woolley Logging Company ("Woolley"). The agreement granted Woolley the use of certain existing logging roads on BLM lands, and permitted the company to construct new roads over specified BLM lands to access its private property.
 
 
 6
 Before beginning new road construction, the agreement required Woolley to submit a map of the project to the BLM for its approval. If within 30 days of the map's submission the BLM did not notify Woolley that the proposed route 1) was not the most direct, 2) would substantially interfere with existing or planned facilities, or 3) would result in excessive soil erosion the agreement deemed the project to have been "approved," and Woolley was free to construct the proposed road. Specifically, the agreement provided that after submitting a map of the proposed project,
 
 
 7
 Construction may be commenced after the expiration of a thirty (30) day period following the filing of such map unless in the intervening period the landowner shall object to such construction. The landowner may object to the proposed construction only if (1) it does not constitute the most reasonably direct route for the removal of forest products from the lands of the road builder, taking into account the topography of the area, the cost of road construction and the safety of use of such road, (2) the proposed road will substantially interfere with existing or planned facilities or improvements on the lands of the landowner, or (3) would result in excessive erosion to lands of the landowner.
 
 
 8
 (Emphasis added.)
 
 
 9
 In November, 1989, Woolley assigned its rights and duties under the right-of-way agreement to Seneca. The BLM approved the assignment on April 30, 1991, after Seneca agreed to conduct its operations under the permit so as to comply with all water quality standards, all pesticide use standards, and "[a]ll other applicable State and Federal environmental laws, regulations and standards." If Seneca's operations failed to conform with this "environmental stipulation," the agreement allowed the BLM to "discontinue all construction or other operations under [the] permit upon written notice from the Authorized Officer that such operations or any part thereof are in violation of this provision."
 
 
 10
 Pursuant to the right-of-way agreement, on September 20, 1990 Seneca submitted a plat to the BLM displaying its proposal to construct an 810 foot long logging road across BLM land, and requested BLM "approval."[5] Prior to giving its approval, the BLM prepared an EA for Seneca's proposed construction. As part of that process, a BLM biologist reviewed Seneca's proposal and determined the action "may affect" the threatened spotted owl and/or critical habitat. Although the biologist's report is not clear, it appears the problem did not stem from the proposed right-of-way construction, which was characterized as having a low impact, but rather it was the anticipated logging of the accessed private forestland that created a "may affect" situation. The biologist recommended that the BLM initiate consultation with the FWS as required by section 7(a)(2) of the ESA when a federal action may affect a listed species.
 
 
 11
 After the biologist announced his recommendation, the Regional Solicitor of the Department of Interior issued an opinion on the relationship between preexisting reciprocal right-of-way agreements and the ESA. It was the Regional Solicitor's opinion that the BLM did not possess the discretion under the agreements to influence for the benefit of the threatened spotted owl the design of the right-of-way construction. The Regional Solicitor also opined that the addition of an environmental stipulation did not "create additional discretion concerning the permittee's basic right to construct a road over BLM land." Accordingly, the Regional Solicitor concluded that section 7(a)(2) consultation would "serve little purpose ... when the only areas of control remaining to the BLM are not material to the welfare of the species." The opinion suggested that, consistent with an agency's duty to conserve protected species, the BLM alert private parties undertaking right-of-way construction that their activities may result in an incidental taking.
 
 
 12
 On May 5, 1991, the BLM issued a FONSI after determining an EIS was unnecessary because the road construction would "not have any significant impacts on the human environment." The BLM then notified Seneca on June 5, 1991 that in accordance with the right-of-way agreement it approved the road construction, but warned Seneca that a taking of a threatened or endangered species without a section 10(a) incidental take permit violated federal environmental law and could lead to the discontinuance of construction under the 1991 stipulation. Subsequently, the BLM's wildlife biologist amended his prior recommendation, and concluded that although Seneca's proposal may affect the threatened spotted owl, the BLM need not consult with the FWS because under the right-of-way agreement it lacked the discretion to modify or halt Seneca's construction.
 
 
 13
 Seneca began constructing the road in the fall of 1991, but before its completion Sierra Club filed suit against the BLM in federal district court seeking a temporary restraining order to halt the project. Seneca intervened and subsequently consented to a preliminary injunction prohibiting all road construction and timber harvest.
 
 
 14
 Sierra Club claims the BLM violated the ESA by failing to consult with the FWS concerning the effects of Seneca's road construction on the threatened spotted owl and its critical habitat. Sierra Club also claims the BLM violated NEPA by preparing an inadequate EA and by failing to prepare an EIS. On cross-motions for summary judgment, the district court granted BLM and Seneca's motion on the NEPA claim, but granted Sierra Club's motion on the ESA claim. The district court determined that the EA prepared by the BLM met the procedural requirements of NEPA. However, the district court concluded that under section 7(a)(2) of the ESA it was necessary for the BLM to consult with the FWS in order to determine whether Seneca was required to obtain a section 10(a) incidental take permit. Accordingly, the district court enjoined further road construction until either the BLM initiated consultation with the FWS or Seneca obtained a ESA section 10(a) incidental take permit. All the parties appeal.
 
 STANDARD OF REVIEW
 
 15
 A grant of summary judgment is reviewed de novo. Jesinger v. Nevada Fed. Credit Union, 24 F.3d 1127, 1130 (9th Cir.1994). De novo review of a district court judgment concerning a decision of an administrative agency means we view the case from the same position as the district court. Nevada Land Action Ass'n v. United States Forest Service, 8 F.3d 713, 716 (9th Cir.1993). "A decision of an administrative agency must be set aside if the action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law or if the action failed to meet statutory, procedural, or constitutional requirements." Id. (internal quotations omitted). We may affirm the district court's grant of summary judgment on any ground supported by the record. Weissich v. United States, 4 F.3d 810, 812 (9th Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 2705, 129 L.Ed.2d 833 (1994).
 
 
 16
 "An agency's interpretation of a statute that the agency is charged with administering is entitled to substantial deference, and an agency's interpretation of its regulations is controlling if not plainly erroneous or inconsistent with the regulations." Norfolk Energy, Inc. v. Hodel, 898 F.2d 1435, 1439 (9th Cir.1990) (internal citation and quotations omitted).
 
 DISCUSSION
 A. The ESA Claim
 
 17
 All the parties now agree that the district court erred in concluding the BLM possessed the statutory power and duty to require Seneca to obtain a section 10(a) incidental take permit. The only issue remaining, therefore, is whether the BLM's failure to consult with the FWS on Seneca's right-of-way construction was a violation of the consultation provisions of section 7.
 
 
 18
 Sierra Club claims the BLM, by permitting Seneca to construct a logging road across BLM forestland, has engaged in an action that triggers the agency's duty under section 7(a)(2) to consult with the FWS.
 
 
 19
 On the other hand, the BLM contends the procedural requirements of section 7(a)(2) do not apply to this case because the relevant agency action occurred prior to the passage of the ESA when, in 1962, the BLM granted right-of-way across its lands as part of the reciprocal right-of-way agreement. Relying on the opinion of the Department of Interior's Regional Solicitor, the BLM asserts its current, limited discretion to modify or deny Seneca's road construction project does not constitute an authorization, funding, or carrying out of an action within the meaning of section 7. Similarly, the BLM contends the 1991 environmental stipulation does not broaden its discretion as that agreement provides for the cessation of construction only after a violation of an environmental standard or law. Accordingly, the BLM maintains that the procedural requirements of the ESA are inapposite because the BLM lacks the ability to influence Seneca's actions for the benefit of the threatened spotted owl. We agree, and for the reasons set forth below, we hold that in these narrow circumstances section 7 does not apply to Seneca's right-of-way construction.[6]
 
 1. The Preexisting Right-of-Way Agreement
 
 20
 Within the limitations prescribed by the Constitution, Congress undoubtedly has the power to regulate all conduct capable of harming protected species. However, Congress chose to apply section 7(a)(2) to federal relationships with private entities only when the federal agency acts to authorize, fund, or carry out the relevant activity. 16 U.S.C. Sec. 1536(a)(2) (referring to such acts as an "agency action"). The intent of Congress, while clear enough from the plain language of the statute, has been confirmed by the administering agency's interpretation of section 7(a)(2), and by case law applying that section.
 
 
 21
 The regulations implementing section 7(a)(2) define "action" to mean "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," and offer as examples "the granting of licenses, contracts, leases, easements, right-of-way, permits, or grants-in-aid."[7] 50 C.F.R. Sec. 402.02. Thus, after enactment of the ESA the execution of a reciprocal right-of-way agreement clearly would implicate section 7(a)(2). See, e.g., Conner v. Burford, 848 F.2d 1441, 1454-58 (9th Cir.1988) (holding that the BLM must comply with section 7 by identifying all the potential impacts on a protected species of all post-leasing activities before entering into lease agreements), cert. denied, 489 U.S. 1012, 109 S.Ct. 1121, 103 L.Ed.2d 184 (1989). Similarly, a project undertaken pursuant to a preexisting agreement could not avoid the procedural requirements of section 7(a)(2) if the project's implementation depended on an additional agency action. See, e.g., O'Neill v. United States, 50 F.3d 677, 680-81 (9th Cir.1995) (explaining why section 7(a)(2) of the ESA applies to a preexisting water service contract where the United States must act each year to supply the water); Conservation Law Found. v. Andrus, 623 F.2d 712, 715 (1st Cir.1979) (holding that the ESA will apply to any contract the Secretary enters into which requires a future action on the Secretary's part); cf. Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1053-56 (9th Cir.1994) (requiring the Forest Service to reinitiate consultation under section 7(a)(2) to assess the impact of a new species listing where the agency's Land and Resource Management Plans provide continuing authorization of future and ongoing forest management projects), cert. denied, --- U.S. ----, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). The BLM has no quarrel with either of these propositions.
 
 
 22
 The instant case, however, presents a different question: To what extent does section 7 apply where the BLM granted right-of-way by contract to a private entity before passage of the ESA and the agency's continuing ability to influence the private conduct is limited to three factors unrelated to the conservation of the threatened spotted owl.[8]
 
 
 23
 The regulations supply the answer: "Section 7 and the requirements of this part apply to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. Sec. 402.03 (emphasis added); cf. 50 C.F.R. Sec. 402.16 ("Reinitiation of formal consultation is required ..., where discretionary Federal involvement or control over the action has been retained...." (emphasis added)). While the statute and regulations appear clear enough, to the extent they are ambiguous we defer to the agency's interpretation of the laws it administers, and we think that in this case the Regional Solicitor reasonably interpreted the language in question. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, --- U.S. ----, ---- - ----, 115 S.Ct. 2407, 2415-18, 132 L.Ed.2d 597 (1995) (deferring to the Secretary of the Interior's reasonable interpretation of section 9 of the ESA where Congress did not unambiguously manifest its intent to adopt a contrary construction). Significantly, the Regional Solicitor considered the obligations of the BLM under the right-of-way agreement, the regulations, and the statute, and determined there was no discretionary federal action to which section 7(a)(2) could apply.[9]
 
 
 24
 The BLM's inability to influence Seneca's right-of-way project is what sets this case apart from Pacific Rivers. In Pacific Rivers we rejected an attempt by the United States Forest Service to interpret "agency action" as encompassing Land and Resource Management Plans ("LRMPs") only at the time of their adoption. 30 F.3d at 1053-55. Instead we looked to the fact that "[e]very resource plan, permit, contract, or any other document pertaining to the use of the forest must be consistent with the LRMP," id. at 1052, and determined that LRMPs "have ongoing effects extending beyond their mere approval," id. at 1055. Relying upon the liberal construction afforded "agency action" by the Supreme Court and our prior cases, we concluded that the continuing ability of the LRMPs to control forest management projects left little doubt the LRMPs were a "continuing agency action under Sec. 7(a)(2) of the ESA." Id. at 1054-56.
 
 
 25
 In contrast, the fixed agreement in this case has none of the indicia of the LRMPs under review in Pacific Rivers: the right-of-way was granted prior to the enactment of the ESA and there is no further action relevant to the threatened spotted owl that the BLM can take prior to Seneca's exercise of their contractual rights. In light of the statute's plain language, the agency's regulations, and the case law construing the scope of "agency action," we conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.[10]
 
 
 26
 Seeking to avoid the force of this conclusion, Sierra Club argues the ESA implicitly abrogates preexisting agreements such as the one at issue here. Unquestionably, with few exceptions Congress may legislatively alter contractual arrangements to which it is a party. See Madera Irrigation Dist. v. Hancock, 985 F.2d 1397, 1400-01 (9th Cir.) (explaining that within the limitations prescribed by the Fifth Amendment, Congress has the power to modify an agency's contractual commitments to a private entity), cert. denied, --- U.S. ----, 114 S.Ct. 59, 126 L.Ed.2d 29 (1993). Through enactment of subsequent statutory provisions, Congress can modify its contractual obligations and limit the corresponding contractual rights of a private entity. See O'Neill, 50 F.3d at 686 ("[C]ontractual arrangements, including those to which a sovereign itself is party, remain subject to subsequent legislation by the sovereign." (internal quotations omitted)). But when it enacted the ESA, Congress specifically limited the application of section 7(a)(2) to cases where the federal agency retained some measure of control over the private activity. In Tennessee Valley Authority v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), the Supreme Court, while construing the term "agency action" broadly, made plain that Congress did not intend for section 7 to apply retroactively, but only to "projects which remain to be authorized, funded, or carried out" by the federal agency. Id. at 173, 186 & n. 32, 98 S.Ct. at 2291, 2298 n. 32, 57 L.Ed.2d 117. Indeed, the Supreme Court in TVA found a violation of section 7 precisely because the impending federal agency's closure of the Tellico Dam flood gates was certain to destroy the endangered snail darter. Id. at 172-74, 98 S.Ct. at 2290-92.
 
 
 27
 Sierra Club contends the BLM's duty under section 7(a)(1), 16 U.S.C. Sec. 1536(a)(1), to conserve listed species is additional authority for inferring Congress's intent to void preexisting agreements.[11] In Platte River Whooping Crane Trust v. FERC, 962 F.2d 27 (D.C.Cir.1992), the District of Columbia Circuit rejected a similar argument, after determining that section 7 did not empower the Federal Energy Regulatory Commission to alter a license agreement for the benefit of protected species. Id. at 33-34. The Platte River court observed that "the statute directs agencies to 'utilize their authorities' to carry out the ESA's objectives; it does not expand the powers conferred on an agency by its enabling act." Id. at 34. We agree; Sierra Club fails to point to any statutory provision that would allow the BLM to breach its agreement with Seneca.
 
 
 28
 2. The Assignment and Environmental Stipulation
 
 
 29
 Sierra Club argues that even if the BLM is precluded from acting under the original right-of-way agreement, the addition of the environment stipulation at the time of the assignment to Seneca in 1991 compels the BLM to comply with section 7(a)(2).[12] The environmental stipulation does not, however, broaden the BLM's power to disapprove of Seneca's right-of-way construction.[13] The stipulation provides the BLM with a remedial contract right to discontinue Seneca's operations if, and when, there is an environmental infraction; but the BLM does not need to consult with the FWS for Seneca to meet its obligation under the stipulation.[14] Thus, Seneca's project can proceed without authorization from the BLM.[15]
 
 
 30
 3. The BLM's "Actions"
 
 
 31
 Finally, Sierra Club contends Seneca's right-of-way construction was, in fact, authorized by federal agency action. Specifically, Sierra Club points to the BLM letter approving the project, the BLM's preparation of an EA, and the sale of the right-of-way timber to Seneca. As discussed above, we are unable to identify any statutory authority allowing the BLM to burden Seneca's activities under the right-of-way agreement unless and until Seneca violates an environmental provision. Therefore, a BLM "action" will implicate section 7(a)(2) only if it legitimately authorizes Seneca's activity.
 
 
 32
 The BLM did issue a letter to Seneca "approving" its proposal. However, in the letter, the BLM specifically reiterates its limited discretion. Because the right-of-way agreement severely circumscribes the BLM's ability to disapprove of Seneca's project, the issuance of an "approval" letter cannot be construed as an authorization within the meaning of section 7(a)(2).
 
 
 33
 For the same reason, the BLM's preparation of an EA cannot be considered an authorization when Seneca already possessed the right to perform the activity. The BLM contends it adopted the EA format for the limited purpose of determining whether Seneca's proposal implicated one of the three factors allowing for disapproval. It follows from our discussion above that these three factors are the only conditions the BLM properly could consider.
 
 
 34
 Finally, Sierra Club argues that the BLM should have consulted with the FWS before allowing Seneca to harvest right-of-way timber in critical habitat. See 16 U.S.C. Sec. 1536(a)(2). The BLM, however, asserts the agreement provided for the automatic sale of the right-of-way timber as part of the private entity's right to construct the road. This interpretation is not controverted by Sierra Club and is supported by the language of the document.[16] Accordingly, we conclude that Seneca's right to harvest the timber vested upon execution of the right-of-way agreement in 1962.
 
 4. Summary
 
 35
 In sum, we hold that Congress did not intend for section 7 to apply to an agreement finalized before passage of the ESA where the federal agency currently lacks the discretion to influence the private activity for the benefit of the protected species.
 
 
 36
 Our decision is reinforced by a consideration of the ESA as a whole. Not surprisingly, in its effort to stem the tide of species extinction, Congress required more of federal agencies than private entities. See 16 U.S.C. Sec. 1536 (requiring federal agencies to conserve species, to consult, to refrain from adversely modifying critical habitat). These discrete burdens properly fall on a private entity only to the extent the activity is dependent on federal authorization. However, Congress also sought to promote the goals of the Act by prohibiting private actions that "take" protected species. 16 U.S.C. Sec. 1538(a). Congress has therefore indicated that when a wholly private action threatens imminent harm to a listed species the appropriate safeguard is through section 9, 16 U.S.C. Sec. 1538, and not section 7, 16 U.S.C. Sec. 1536. The ESA's citizen suit provision, 16 U.S.C. Sec. 1540(g), allows private plaintiffs, like Sierra Club, to enjoin private activities that are reasonably certain to harm a protected species.[17] Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 784, 787-88 (9th Cir.1995); see also Sweet Home, --- U.S. at ---- - ----, 115 S.Ct. at 2412-18 (upholding regulations that prohibit a private entity from modifying habitat where it could lead to a "taking" of a protected species). We think these statutory provisions and the structure of the Act further demonstrate that Sierra Club's present action is misplaced.
 
 B. The NEPA Claim
 
 37
 To a large extent, our decision concerning Sierra Club's ESA claim dictates the resolution of the NEPA claim. Both of the statutes' procedural requirements are triggered by a discretionary federal action. If anything, case law is more forceful in excusing nondiscretionary agency action or agency "inaction" from the operation of NEPA. See, e.g., Sierra Club v. Penfold, 857 F.2d 1307, 1314 (9th Cir.1988) (holding that the BLM's review of certain mining operations for statutory and regulatory compliance is insufficient to trigger NEPA); State of Alaska v. Andrus, 591 F.2d 537, 540-41 (9th Cir.1979) (holding that governmental inaction does not trigger NEPA); Molokai Homesteaders Coop. Ass'n v. Morton, 506 F.2d 572, 580 (9th Cir.1974) (refusing to characterize the "right of the federal government to object to violations of its loan agreements, or its determination not to object" as a federal action); San Francisco Tomorrow v. Romney, 472 F.2d 1021, 1025 (9th Cir.1973) (holding that where the major federal action occurred before the effective date of NEPA, the federal agency's contractual right to monitor for compliance with statutory and contractual requirements does not implicate NEPA); Goos v. ICC, 911 F.2d 1283, 1293-95 (8th Cir.1990) (collecting cases demonstrating the inapplicability of NEPA to nondiscretionary federal action); City and County of Denver ex rel. Bd. of Water Comm'r v. Bergland, 695 F.2d 465, 481 (10th Cir.1982) (determining that road construction over right-of-way granted prior to NEPA triggers the Act's obligations because further federal action is required). As was true in our ESA analysis, we see no benefit from NEPA compliance where the BLM's ability to modify or halt Seneca's project is limited to the three conditions allowed by the right-of-way agreement.
 
 
 38
 Sierra Club counters the above cases with Sierra Club v. Hodel, 848 F.2d 1068 (10th Cir.1988), where a county was seeking to make road improvements on a right-of-way crossing BLM lands and adjacent to a wilderness study area. In that case the court observed that "[t]he touchstone of major federal action ... is an agency's authority to influence significant nonfederal activity." Id. at 1089. And thus, the question before the court was "whether the BLM either has exercised control over the County's major road improvement project or has the authority and duty to do so." Id. at 1090. The court found a federal action because a provision of the Federal Land Policy and Management Act of 1976, 43 U.S.C. Sec. 1782(c), conferred on the BLM the statutory duty and authority to regulate right-of-way activities to prevent the unnecessary degradation of wilderness study areas. Id. at 1090-91.
 
 
 39
 Sierra Club attempts to analogize the Hodel case to the present situation by asserting that section 7(a)(1) of the ESA, 16 U.S.C. Sec. 1536(a)(1), imposes a mandatory duty on the BLM to conserve protected species and therefore, a NEPA analysis must be performed to identify alternatives that minimize the impact on endangered and threatened species. However, as we have discussed, section 7(a)(1) does not confer additional statutory authority on the BLM allowing it to regulate Seneca's project for the benefit of a protected species. Section 7(a)(1) specifically states that agencies shall "utilize their authorities ... for the conservation of endangered species and threatened species." 16 U.S.C. Sec. 1536(a)(1). While the BLM is under a duty to conserve protected species, it lacks the power to implement alternatives modifying Seneca's road construction.
 
 
 40
 The BLM's inability meaningfully to influence Seneca's right-of-way construction leads us to conclude that the procedural requirements of NEPA do not apply to this case.
 
 CONCLUSION
 
 41
 The district court's grant of summary judgment on Sierra Club's NEPA claim in favor of the BLM and Seneca is affirmed. We reverse the district court's decision on Sierra Club's ESA claim, and remand for consideration consistent with this opinion.
 
 
 42
 AFFIRMED in part, REVERSED in part, and REMANDED.
 
 
 43
 Each party shall bear its own costs.
 
 PREGERSON, Circuit Judge, dissenting:
 
 44
 The issue we must resolve in this case is whether the Bureau of Land Management ("BLM") had discretion to control--for the benefit of the threatened spotted owl--Seneca Sawmill's construction of a road on BLM land. If the BLM had such discretion, then before approving Seneca's road construction the BLM was obligated under section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. Sec. 1536, to consult with the Fish and Wildlife Service ("FWS") before authorizing any "action" that "may affect" the threatened spotted owl. Under the regulations promulgated by the Secretary of the Interior, the section 7 consultation requirement applies "to all actions in which there is discretionary Federal involvement or control." 50 C.F.R. Sec. 402.03 (emphasis added).
 
 
 45
 The majority opinion defers to the conclusion reached by the Regional Solicitor of the Department of the Interior who reviewed this very question. The Regional Solicitor concluded that the BLM did not retain discretion under the right-of-way agreements to influence--for the benefit of the spotted owl--the construction of roads on BLM land. The Regional Solicitor also concluded that the addition of the environmental stipulation did not give the BLM any additional discretion over permittees' rights to construct roads on BLM land. The environmental stipulation authorized the BLM to halt construction of the roadway if Seneca violates any environmental law. I am disinclined to accept such a categorical denial of the existence of agency discretion.
 
 
 46
 The majority opinion cites Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, --- U.S. ----, ---- - ----, 115 S.Ct. 2407, 2415-18, 132 L.Ed.2d 597 (1995) for the proposition that we should defer to the Regional Solicitor's interpretation where Congress "did not unambiguously manifest its intent" to adopt a contrary construction. But the statutory language at issue in the present case, i.e., the words "agency action," is not ambiguous.
 
 
 47
 "[T]here is little doubt that Congress intended to enact a broad definition of agency action in the ESA." Pacific Rivers Council v. Thomas, 30 F.3d 1050, 1054 (9th Cir.1994), cert. denied, --- U.S. ----, 115 S.Ct. 1793, 131 L.Ed.2d 721 (1995). In Pacific Rivers, we concluded that "[t]he ESA's plain language affirmatively commands all federal agencies to 'insure that any action authorized, funded or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or result in the destruction or adverse modification of habitat to such species.' " Id. (quoting 16 U.S.C. Sec. 1536(a)(2)) (emphasis in original). Moreover, the Supreme Court noted in TVA v. Hill, 437 U.S. 153, 173, 98 S.Ct. 2279, 2291-92, 57 L.Ed.2d 117 (1978), that this definition of agency action "admits of no exception."
 
 
 48
 Instead of deferring to the findings of the Regional Solicitor, we should instead follow the canon of statutory construction which requires us to "reject administrative constructions which are contrary to clear congressional intent." I.N.S. v. Cardoza-Fonseca, 480 U.S. 421, 447-48, 107 S.Ct. 1207, 1221, 94 L.Ed.2d 434 (1987).
 
 
 49
 Here, the Regional Solicitor's conclusion that the BLM did not retain discretion to influence--for the benefit of the spotted owl--the permittees' construction of roads under the right-of-way agreements thwarts Congress's explicit instruction that "agency action" be read broadly. Unlike the view expressed in the majority opinion, I believe that the BLM retained discretion to influence the roadway project for the benefit of the spotted owl. The BLM had the right under the contract to review the location of the proposed road and object if it concluded that the planned road was not the most direct and reasonable route. Moreover, under the stipulation, the BLM could halt the project if it believed that Seneca's construction would be likely to violate section 9 of the ESA or any other environmental law. The authority to review the project pursuant to the contract or stop it until the conditions of the environmental stipulation are met plainly constitutes "discretion," albeit limited.
 
 
 50
 The dictionary definition of "discretion" is "the power or right to decide or act according to one's own judgment." The Random House College Dictionary 379 (1980). Both the contractual review and the environmental stipulation must then require the BLM to consult with FWS to assess whether a "taking" will occur and to discontinue Seneca's construction if such is the case, or pursue any viable alternative which can be worked out given the terms of the contract.
 
 
 51
 At the very least, because the BLM had to review the planned project to determine whether it could ascertain any objections, its "approval" constitutes agency action for purposes of triggering the Act. Here, the BLM wildlife biologist concluded in his amended report that Seneca's proposed construction "may affect" the threatened spotted owl.[1] An action which "may affect" a listed species is one which could jeopardize the continued existence of that species. 16 U.S.C. Sec. 1536(a)(2). Thus, consultation was required.
 
 
 52
 Therefore, I would affirm the ruling of the district court on the Sierra Club's ESA claim on the basis that under the contract and the environmental stipulation, the BLM retained some discretion to control Seneca's construction project for the benefit of the spotted owl. Because the BLM retained some discretion, its approval and countenance of the project is an action which may affect the owl; therefore, consultation with FWS is required to ensure that even such limited discretion is exercised in the best interest of the endangered species.
 
 
 
 *
 The Honorable James M. Fitzgerald, Senior United States District Judge for the District of Alaska, sitting by designation
 
 
 [1]
 The acting agency must consult with the National Marine Fisheries Service ("NMFS") in those cases where the affected species is within NMFS's purview. 50 C.F.R. Sec. 402.01(b)
 
 
 [2]
 "The term 'take' means to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct." 16 U.S.C. Sec. 1532(19)
 
 
 [3]
 An incidental taking is a taking of a protected species "incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. Sec. 1539(a)(1)(B)
 
 
 [4]
 As the district court explained: "A reciprocal right-of-way agreement is an exchange of grants between the United States and a private landowner, called a permittee. Under these agreements, each party may use the other's existing roads and may construct roads over the other's land."
 
 
 [5]
 Seneca later voluntarily changed the location of the proposed road so that it crossed only 410 feet of BLM land
 
 
 [6]
 Seneca contends BLM's conduct is inaction and therefore section 7(a)(2) does not apply. In light of our decision, we do not address this argument
 
 
 [7]
 Sierra Club claims that because the precise location of the right-of-way construction was not identified in the original agreement, Seneca's right-of-way application to the BLM comes within this regulatory provision. Sierra Club, however, reads out the requirement that the BLM engage in an action that authorizes, funds, or carries out the activity. Seneca possesses a preexisting right to construct a road across designated BLM forestland. The BLM's ability to influence the road's location is limited to notifying Seneca that the chosen route is not the most direct, that it would interfere with a BLM facility, or that it would cause excessive erosion. None of these factors are relevant to the protection of the threatened spotted owl
 
 
 [8]
 Sierra Club does not seriously contest this interpretation of the right-of-way agreement. Because the agreement identifies both the nature and scope of the right-of-way grant in "clear and explicit terms," Knoxville Water Co. v. City of Knoxville, 200 U.S. 22, 34, 26 S.Ct. 224, 227, 50 L.Ed. 353 (1906), the doctrine that requires a construction of a "grant of property, franchise[ ], or privilege[ ] in which the government or the public has an interest ... strictly in favor of the public," id., is not a factor in this case
 
 
 [9]
 Sierra Club argues that the Regional Solicitor's opinion should be discounted because it ignores the BLM's internal guidelines contained in the BLM's manual handbook and the BLM's Roseburg final EIS. Both the cited documents contain statements that the BLM readily acknowledges to be true: If the BLM enters into a post-ESA right-of-way agreement or retains the discretion to authorize the private entity's activity, the BLM must comply with the ESA. These accurate statements of the law do not contradict the Solicitor's analysis
 
 
 [10]
 The dissent "believe[s] that the BLM retained discretion to influence the roadway project for the benefit of the spotted owl," but does not identify the precise source of the BLM's "retained discretion." The right-of-way agreement allows the BLM to object to Seneca's project in three limited instances, none of which are in issue here and, in any event, are conditions unrelated to the protection of a protected species. Thus, the BLM lacks authority under the agreement to modify the road construction project for the benefit of the threatened spotted owl
 A "may affect" determination does not provide statutory authority to regulate Seneca's private activity. To the contrary, a "may affect" finding is only a preliminary step in a procedural process that is designed to identify federal actions that in fact are likely to jeopardize the continued existence of a protected species, 16 U.S.C. Sec. 1536(a)(2); 50 C.F.R. Secs. 402.10-402.16; Pacific Rivers, 30 F.3d at 1052 n. 2, 1054 n. 8, and to offer reasonable and prudent alternatives to a federal activity that is determined to violate section 7's substantive prohibition, 16 U.S.C. Sec. 1536(b)(4). Obviously, without authority to modify Seneca's project, identification of reasonable and prudent alternatives serves no purpose.
 Finally, while we agree with the dissent that section 9 of the ESA allows the government to halt a private activity that is reasonably certain to result in a "taking," see Forest Conservation Council v. Rosboro Lumber Co., 50 F.3d 781, 787-88 (9th Cir.1995), we are unable to discern the relevance of the section 7(a)(2) consultation procedures to the enforcement of the substantive proscriptions contained in section 9. Without reference to section 7, the Act declares a violation of section 9 unlawful, 16 U.S.C. Sec. 1538(a)(1), and provides for injunctive relief, 16 U.S.C. Sec. 1540(e)(6), as well as civil and criminal sanctions, 16 U.S.C. Sec. 1540(a), (b). To overlay section 9 enforcement with section 7 consultation creates a redundancy that is contrary to a basic rule of statutory construction: "one provision should not be interpreted in a way which is internally contradictory or that renders other provisions of the same statute inconsistent or meaningless." United States v. Powell, 6 F.3d 611, 614 (9th Cir.1993) (internal quotations omitted).
 
 
 [11]
 Section 7(a)(1) requires a federal agency to utilize its authority in furtherance of the purposes of the ESA by carrying out programs for the conservation of protected species
 
 
 [12]
 Sierra club does not legally challenge the BLM's approval of the right-of-way assignment to Seneca. Accordingly, we do not decide whether, and to what extent, the BLM is required to comply with NEPA and section 7(a)(2) of the ESA when approving such an assignment
 Sierra Club does argue that the BLM's failure to include language in the agreement allowing for section 7(a)(2) compliance requires this court to read the environmental stipulation as if it did provide for consultation. This remarkable proposition is unsupported by legal authority. Sierra Club's remedy in this regard is to challenge the right-of-way assignment.
 
 
 [13]
 The environmental stipulation allows the BLM to "discontinue all construction or other operations under [the] permit upon written notice from the Authorized Officer that such operations or any part thereof are in violation" of an environmental law or standard
 
 
 [14]
 Even without the environmental stipulation, Seneca's operations are subject to all applicable environmental regulations and laws. See Peterson v. United States Dep't of Interior, 899 F.2d 799, 807-08 (9th Cir.), cert. denied, 498 U.S. 1003, 111 S.Ct. 567, 112 L.Ed.2d 574 (1990). The apparent purpose of the stipulation was to allow the BLM to terminate Seneca's contractual right to complete a project if during the project's implementation Seneca violated an environmental standard
 
 
 [15]
 The dissent suggests that the BLM's remedial contract right pursuant to the environmental stipulation, together with a section 9 violation, constitutes an agency action. We respectfully disagree
 The section 7 consultation procedures are not relevant to the enforcement of section 9. See 16 U.S.C. Sec. 1538(a)(1). If Seneca violates section 9, or any other environmental standard, the BLM need not consult with the FWS before exercising its right under the environmental stipulation to terminate the offending project. Indeed, section 7(a)(1) would appear to require the BLM to utilize its authority under the stipulation to suspend an activity that would result in a taking. 16 U.S.C. Sec. 1536(a)(1). Sierra Club, however, abandoned its taking claim, and there is no evidence in the record establishing a section 9 violation.
 
 
 [16]
 The 1962 right-of-way agreement states: "Prior to the construction of a road on the lands of the other party, the timber on the right-of-way shall be cruised and paid for."
 
 
 [17]
 The Act confers the same ability on the Attorney General. 16 U.S.C. Sec. 1540(e)(6)
 
 
 [1]
 The implementing regulations of section 7 of the ESA require federal agencies to consult with the appropriate federal fish and wildlife agency--in this case the FWS--whenever their actions "may affect" an endangered or threatened species. See 50 C.F.R. Sec. 402.14(a)