PAEZ, Circuit Judge,
dissenting:
I respectfully dissent. I agree with the majority that this case is not moot. I disagree with the majority’s holdings that the plaintiffs lack standing to challenge the Bureau’s renewal of the Delta-Mendota Canal (“DMC”) contracts and that § 7(a)(2) of the Endangered Species Act (“ESA”), 16 U.S.C. § 1536(a)(2), does not apply to the United States Bureau of Reclamation’s (“Bureau”) renewals of the Sacramento River Settlement (“SRS”) contracts. Accordingly, I would reverse the district court’s grant of summary judgment to the defendants and remand for further proceedings.
I
I can not agree with the majority’s holding that the plaintiffs lack standing to challenge the Bureau’s renewals of the DMC contracts. Because the plaintiffs allege a straightforward procedural injury, they “must show only that they have a procedural right that, if exercised, could protect their concrete interests.” Defenders of Wildlife v. EPA, 420 F.3d 946, 957 (9th Cir.2005) (emphasis in original), overruled on other grounds by Nat’l Assoc. of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007). In my view, the plaintiffs have easily made such a showing.
The plaintiffs argue that the Bureau violated the ESA when it renewed the 41 contracts at issue in this case — including the DMC contracts — without consulting with the United States Fish and Wildlife Service (the “Service”) on whether its actions were “likely to jeopardize the continued existence of’ the delta smelt, a threatened species. See ESA § 7(a)(2), 16 U.S.C. § 1536(a)(2).[1] I agree with the ma *1101 Jonty’s conclusion that the plaintiffs alleged a procedural injury. Our precedent makes clear, then, that the plaintiffs have standing if they can demonstrate that ESA compliance by the Bureau could advance their concrete interest in protecting the delta smelt and its habitat. See Salmon Spawning & Recovery Alliance v. Gutierrez, 545 F.3d 1220, 1226 (9th Cir.2008); Defenders of Wildlife, 420 F.3d at 957.
The plaintiffs have presented extensive evidence from which a reasonable factfinder could conclude that the Bureau’s ESA compliance would likely improve the conditions of the delta smelt and its habitat.[2] For example, the plaintiffs allege that if the Bureau were to consult with the Service on the DMC contracts, it might choose to provide less water to the contractors, which would improve the conditions of the delta smelt and its habitat. The plaintiffs also allege that consultation by the Bureau might result in a pricing structure that is more protective of the delta smelt and its habitat. Finally, the plaintiffs allege that if the Bureau were to consult on the contracts, it might choose to alter the timing of water deliveries, which could inure to the benefit of the delta smelt and its habitat. The plaintiffs’ allegations and the record evidence to support them would allow a reasonable factfinder to conclude that the Bureau’s ESA compliance could further the plaintiffs’ concrete interest in protecting the delta smelt and its habitat. On this record, I would hold that the plaintiffs have standing to challenge the DMC contracts.
The majority places unwarranted emphasis on the shortage provision of the DMC contracts. As the majority explains, this provision allows the Bureau to forsake water deliveries to the DMC contractors as necessary to comply with the ESA.[3] The majority concludes that because the terms of the DMC contracts authorize the Bureau to comply with the ESA, the plaintiffs do not have standing to assert a claim that the Bureau is violating the consultation requirement of ESA § 7(a)(2). This reasoning makes no sense. That the contracts allow the Bureau to comply with the ESA certainly does not ensure that the Bureau will do so. The plaintiffs contend that the Bureau violated the ESA; the fact that the DMC contracts contain a shortage provision tells us nothing about whether the plaintiffs are right.[4] Therefore, I dissent from the majority’s holding that the plaintiffs lack standing to challenge the Bureau’s renewals of the DMC contracts at issue in this case.
*1102 II
I also disagree with the majority’s holding that the requirements of ESA § 7(a)(2) do not apply to the Bureau’s renewals of the SRS contracts. Pursuant to 50 C.F.R. § 402.03, the requirements of ESA § 7(a)(2) “apply to all actions in which there is discretionary Federal involvement or control.” The Supreme Court upheld this regulation in Nat'l Assoc. of Home Builders v. Defenders of Wildlife, stating, “§ 7(a)(2)’s no-jeopardy duty covers only discretionary agency actions and does not attach to actions ... that an agency is required by statute to undertake once certain specified triggering events have occurred.” 551 U.S. 644, 669, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007) (emphasis in original). I disagree with the majority’s conclusion that the Bureau’s renewals of the SRS contracts were not discretionary agency actions.
A federal agency action is not discretionary when “consultation would be a meaningless exercise” and when “the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.” Sierra Club v. Babbitt, 65 F.3d 1502, 1509 (9th Cir.1995). For example, when an agency “cannot simultaneously obey the differing mandates set forth in [ESA] § 7(a)(2)” and another statutory provision, the agency need not follow § 7(a)(2). See Home Builders, 551 U.S. at 666, 127 S.Ct. 2518 (holding that EPA action was not discretionary where mandated by the Clean Air Act); see also Babbitt, 65 F.3d at 1509. On the other hand, “if the project’s implementation depend[s] on additional agency action,” then the agency “c[an] not avoid the procedural requirements of section 7(a)(2).” Babbitt, 65 F.3d at 1509; see also Karuk Tribe of California v. U.S. Forest Serv., 681 F.3d 1006, 1026-27 (9th Cir.2012) (en banc) (“Under our established case law, there is ‘agency action’ sufficient to trigger the ESA consultation duty whenever an agency makes an affirmative, discretionary decision about whether, or under what conditions, to allow private activity to proceed.”).
The plaintiffs contend that the Bureau’s renewals of the SRS contracts were discretionary actions for two reasons: (a) because the Bureau could have chosen simply to not renew the SRS contracts; and (b) because the Bureau could have negotiated terms in the renewed SRS contracts that were protective of the delta smelt and its habitat. I agree with the plaintiffs.
A. Discretion Not to Renew the SRS Contracts
1. Central Valley Project Improvement Act
The majority holds that the Central Valley Project Improvement Act (“CVPIA”) § 3404(c) compels the Bureau to renew the SRS contracts. Op. at 1099. I disagree. CVPIA § 3404(c) provides, “the Secretary shall, upon request, renew any existing long-term repayment or water service contract for the delivery of water from the Central Valley Project for a period of twenty-five years and may renew such contracts for successive periods of up to 25 years each.” CVPIA § 3404(c), 106 Stat. 4600, 4707 (1992). By its terms, CVPIA § 3404(c) applies only to “long-term repayment [and] water service” contracts. There are several reasons to conclude that the SRS contracts are not “water service” contracts within the meaning of § 3404(c).[5]
*1103 First, the CVPIA expressly distinguishes SRS contracts from “water service” contracts in another section, § 3405(a).[6] Section 3405(a) thus demonstrates that Congress considered “water service” contracts and settlement contracts to be two distinct categories of contracts. Accord Powerex Corp. v. Reliant Energy Servs., Inc., 551 U.S. 224, 232, 127 S.Ct. 2411, 168 L.Ed.2d 112 (2007) (“A standard principle of statutory construction provides that identical words and phrases within the same statute should normally be given the same meaning.”).
Second, § 3404(c) refers to contracts for “water from the Central Valley Project.” The CVPIA defines “Central Valley Project water” as “[a]ll water that is developed, diverted, stored or delivered by the Secretary in accordance with the statutes authorizing the Central Valley Project and in accordance with the terms and conditions of water rights acquired pursuant to California Law.” § 3403(f) (emphasis added). The SRS contractors persuasively argue that the water they use is not “Central Valley Project water” because it is not diverted by the federal government. Rather, the SRS contractors divert water directly from the Sacramento River. Because the SRS contracts do not involve “Central Valley Project water,” § 3404(c) seems inapplicable.
Third, until this litigation, the Bureau had taken the position that the SRS contracts are not “water service” contracts within the meaning of § 3404(c).[7] Of course, that the Bureau has changed course is not fatal to its argument, but it is powerful evidence that Congress did not intend § 3404(c) to apply to the SRS contracts.[8] Moreover, in 2004 Congress passed a rider to is appropriations bill that provided two additional years for the SRS contracts to be renewed, apparently contemplating the possibility that the SRS contracts would otherwise expire. Energy Water Development Appropriation Act, Pub.L. No. 108-137, 117 Stat. 1827 (2003). For these reasons, I would hold that CVPIA § 3404(c) does not require renewal of the SRS contracts.
2. State Water Resources Control Board Decision 990
I disagree with the majority’s holding that a decision of California’s State Water Resources Control Board (SWRCB) requires the Bureau to renew the SRS contracts. Op. at 1099. In 1961, the SWRCB issued Decision 990 (“D-990”), which granted the Bureau state water permits to operate the CVP. Federal law requires the Bureau to comply with this decision. 43 U.S.C. § 383; see also California v. United States, 438 U.S. 645, 653, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978).
*1104 The SRS contractors argue that Condition 23 of D-990 compels the Bureau to renew the SRS contracts. Condition 23 provides:
The export of stored water under [the applicable permits] outside the watershed of Sacramento River Basin or beyond the Sacramento-San Joaquin Delta shall be subject to the reasonable beneficial use of said stored water within said watershed and Delta, both present and prospective, provided, however, that agreements for the use of said stored water are entered into with the United States prior to March 1, 1964, by parties currently diverting water from Sacramento River and/or Sacramento-San Joaquin Delta....
Like the district court, I read Condition 23 to have simply imposed a deadline — March 1, 1964 — by which the parties were required to enter into the SRS contracts. It seems implausible that Condition 23 meant that the SRS contracts, entered for 40-year terms, were permanent. Therefore, I would reject the SRS contractors’ argument that D-990 compels renewal of the SRS contracts.
Having concluded that the Bureau has discretion simply not to renew the SRS contracts, I would hold that the Bureau must comply with ESA § 7(a)(2). See, e.g., NRDC v. Houston, 146 F.3d 1118, 1126 (9th Cir.1998); Turtle Island v. Nat’l Marine Fisheries Serv., 340 F.3d 969, 977 (9th Cir.2003).
B. Discretion to Negotiate the Terms of the SRS Renewal Contracts
1. Contract Language
The majority holds that a provision contained in the original SRS contracts constrains the Bureau’s discretion to negotiate terms upon renewal that might inure to the benefit of the delta smelt.[9] I disagree. Because I would conclude that the original SRS contracts do not prevent the Bureau from renewing the SRS contracts on terms that might benefit the delta smelt and its habitat, I would hold that the Bureau must comply with the consultation requirements of ESA § 7(a)(2). See Houston, 146 F.3d at 1126 (holding that “there was discretion available to the Bureau during the negotiation process” where, like here, the government was entitled to renew water contracts on “mutually agreeable” terms).
The district court correctly noted that we must “look to general principles concerning the interpretation of contracts” in interpreting a contract to which the United States is a party. NRDC v. Kempthorne (NRDC II), 621 F.Supp.2d 954, 980 (E.D.Cal.2009). One of the bedrock principles of contract interpretation is that “[a] written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations.” Klamath Water Users Protective Ass’n v. Patterson, 204 F.3d 1206, 1210 (9th Cir.1999) (quoted in NRDC II, 621 F.Supp.2d at 980). Moreover, we must interpret the SRS renewal contracts “so as to avoid internal conflict.” Trident Ctr. v. Conn. Gen. Life Ins. Co., 847 F.2d 564, 566 (9th Cir.1988) (quoted in NRDC II, 621 F.Supp.2d at 980).
I disagree with the majority’s holding that Article 9(a) of the original SRS contracts prevents the Bureau from negotiating the terms of the renewed SRS con *1105 tracts. Article 9(a) of each original SRS contract provides:
(a) During the term of this contract and any renewal thereof:
(1) It shall constitute the full agreement as between the United States and the Contractor as to the quantities of water and the allocation thereof between the base supply and Project Water which may be diverted by the Contractor from the Sacramento River for beneficial use ... which said diversion, use, and allocation shall not be disturbed so long as the Contractor shall fulfill all its obligations hereunder; and
(2) The Contractor shall not claim any right against the United States in conflict with the provisions thereof.
Like the district court, the majority interprets Article 9(a) to mean that the terms of the original SRS contracts constitute full agreement on all material terms, for all future renewals of the contracts. Op. at 1099-1100. Read in isolation, Article 9(a)’s use of the phrase “full agreement” does seem to preclude the possibility of renegotiating the terms of the SRS contracts upon renewal. Read in context, however, the majority’s interpretation is unworkable because Article 2 of each SRS contract provides:
This contract shall remain in effect until and including March 31, 2004: Provided, That under terms and conditions mutually agreeable to the parties hereto, renewals may be made for successive period not to exceed forty (40) years each. The terms and conditions of each renewal shall be agreed upon not later than one (1) year prior to the expiration of the then existing contract ...
(emphasis added). The language of Article 2 strongly suggests that the parties anticipated renegotiating the terms of the SRS contracts upon renewal.
In light of Article 2 and the history of the SRS contracts, I interpret Article 9(a) to be a partial integration clause, which merely guarantees that each SRS contract (and renewal thereof) constitutes a “full agreement” between the parties with respect to water quantity and allocation. In other words, it appears that Article 9(a) was included in each SRS contract to avoid litigating the extent of the SRS contractors’ underlying water rights.[10] The majority’s interpretation — that Article 9(a) freezes in perpetuity the precise water quantity and allocation terms of each SRS contract — is illogical in light of Article 2, which expressly states that the terms and conditions of the renewal contracts must be “mutually agreeable.” Thus, I would hold that Articles 2 and 9(a) must be harmonized, and that the only sensible reading of Article 9(a) is that it is a partial integration clause.
Moreover, even if Article 9(a) did constrain the Bureau’s discretion to renegotiate the water quantity and allocation terms of the SRS contracts upon renewal — which I do not think it does — the plaintiffs persuasively point out that Article 9(a), by its terms, does not constrain the Bureau’s discretion to renegotiate non-quantity contract terms, such as the terms governing the pricing and timing of water deliveries. Because the Bureau has discretion to negotiate terms of the SRS renewal contracts that could inure to the benefit of the delta smelt, I would hold that it must comply with ESA § 7(a)(2). I therefore dissent from the majority’s holding that *1106 the Bureau was not required to comply with the consultation requirements of § 7(a)(2) in renewing the SRS contracts.
Ill
For the foregoing reasons, I would reverse the district court’s grant of summary judgment to the defendants and remand this case to the district court for consideration in the first instance of the merits of the plaintiffs’ claims involving the DMC contracts and for further consideration of the plaintiffs’ claims involving the SRS contracts.

. ESA § 7(a)(2) provides that, ”[e]ach Federal agency shall, in consultation with and with the assistance of the Secretary [of the Interi- or], insure that any action authorized, funded, or carried out by such agency ... is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary ... to be critical.” 16 U.S.C. § 1536(a)(2).

. Because we are reviewing a grant of summary judgment to the defendants, we must resolve all factual disputes in favor of the plaintiffs in determining whether they have standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

. Specifically, as the district court noted, each DMC contract contains a provision that expressly “allows the Bureau to take actions to protect Delta smelt, including not delivering any water to DMC contractors if required to comply with section 7(a)(2)....” NRDC v. Kempthorne (NRDC I), 2008 WL 5054115 at *15 (E.D.Cal.2008).

. In addition to a shortage provision, the DMC contracts also contain a liability-release provision that "relieves the Bureau of liability for any direct or indirect damage arising from reduced deliveries to DMC Contractors as a result of, among other things, actions taken by the Contracting Officer to meet legal obligations.” NRDC I, 2008 WL 5054115 at !T5 (internal quotation marks omitted). I see one feature of the liability-release and shortage provisions that could inform our standing analysis, and it favors the plaintiffs' redressability argument. Because the liability-release and shortage provisions give the Bureau the ability to comply with the ESA without breaching the DMC contracts, these provisions guarantee that the DMC contracts are not a barrier to the Bureau's ability to redress the plaintiffs' alleged injuries.

. It is undisputed that the SRS contracts are not "long-term repayment” contracts, as referenced in § 3404(c).

. Section 3405(a) gives "all individuals or districts who receive Central Valley Project water under water service or repayment contracts, water rights settlement contracts, or exchange contracts” the right to transfer water. (emphasis added).

. For example, in its 2004 EIS on the SRS contract renewals, the Bureau explained that “[t]he CVPIA expressly distinguishes Settlement Contracts from 'CVP water service contracts’ or 'repayment contracts.' ” The Bureau even noted that "it is common for commentors to mistake CVPIA provisions relating to other types of contracts (i.e. water service contracts or repayment contracts, sometimes referred to as 9(e) contracts) as relating to all types of CVP water contracts. This is not the case.... [T]he provision in Section 3404(c) limiting the term of repayment and water service contracts to a period not to exceed 25 years does not apply to the Settlement Contracts.” ER 1844-45.

.The Bureau now characterizes the SRS contracts as “hybrid” contracts that are "both water service and settlement contracts.” The CVPIA, however, does not refer to "hybrid” contracts.

. As the district court noted, "[u]nder certain circumstances, a prior agreement, permit, or management decision that predates the listing of a species may constrain a federal agency’s ability to take action on behalf of that listed species, absolving the agency from the requirement of consultation.” NRDC II, 621 F.Supp.2d at 976 (E.D.Cal.2009) (citing Babbitt, 65 F.3d at 1509).

. The Bureau and the Sacramento River water users entered the SRS contracts in 1964 after the SWRCB instructed the parties to reach a settlement agreement rather than engage in a "lengthy and extremely costly adjudication of the waters of the Sacramento River and its tributaries.”