255 F.3d 1073 (9th Cir. 2001)
 ENVIRONMENTAL PROTECTION INFORMATION CENTER, A NON-PROFIT CORPORATION, PLAINTIFF-APPELLANT,
v.
THE SIMPSON TIMBER COMPANY; SIMPSON REDWOOD COMPANY; ARCATA REDWOOD COMPANY; UNITED STATES FISHAND WILDLIFE SERVICE, DEFENDANTS-APPELLEES.
 No. 99-15896
 UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
 Argued and Submitted October 2, 2000--San Francisco, California
Filed July 9, 2001
 
 Neil Levine, Earthlaw, Denver, Colorado, for appellant Environmental Protection Information Center.
 Alson R. Kemp, Pillsbury Madison & Sutro, San Francisco, California, for appellees Simpson Timber Company, Simpson Redwood Company and Arcata Redwood Company.
 David C. Shilton, United States Department of Justice, Environment & Natural Resources Division, Washington, Dc, for appellee United States Fish and Wildlife Service.
 Appeal from the United States District Court for the Northern District of California Charles R. Breyer, District Judge, Presiding D.C. No. CV-98-03740-CRB
 Before: Dorothy W. Nelson, David R. Thompson and Stephen S. Trott, Circuit Judges.
 
 
 1
 Opinion by Judge Thompson; Dissent by Judge D.W. Nelson
 
 OPINION
 
 2
 The Environmental Protection Information Center ("EPIC") filed suit against the United States Fish and Wildlife Service ("FWS") and Simpson Timber Company, Simpson Redwood Company and Arcata Redwood Company ("Simpson"). EPIC alleged that the FWS violated section 7 of the Endangered Species Act ("ESA"), 16 U.S.C.§§ 1536 (1994), by refusing to reinitiate consultation with itself about the effect that an incidental take permit issued to Simpson for the northern spotted owl might have on two other species-the marbled murrelet and the coho salmon. The marbled murrelet and the coho salmon were added to the threatened species list after the FWS issued the spotted owl permit to Simpson. EPIC sought an injunction to halt Simpson's logging activities on its 380,000 acres of timberland in northern California until the FWS had reinitiated and completed the sought-after consultation. See 50 C.F.R.§§ 402.16 (2000).
 
 
 3
 The district court granted Simpson's motion to dismiss the complaint for failure to state a claim. See Fed. R. Civ. P. 12(b)(6).[1] The court held that the FWS had not retained sufficient discretionary control over Simpson's incidental take permit to require it to take steps that would benefit the marbled murrelet or the coho salmon, and therefore reinitiation of consultation was not required. EPIC appeals. We have jurisdiction under 28 U.S.C. §§ 1291 (1994) and we affirm.
 
 I.
 
 4
 Section 9 of the ESA makes it unlawful to "take" an endangered species. See 16 U.S.C. §§ 1538(a)(1)(B) (1994). The FWS has extended this prohibition by regulation to include threatened species. See 50 C.F.R.§§ 17.31(a) (2000). The term "take" is defined broadly to mean"harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect." 16 U.S.C. §§ 1532(19) (1994). The Secretary of the Interior has interpreted the term "harm" to cover "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. §§ 17.3 (2000). Eliminating a threatened species' habitat thus can constitute "taking" that species for purposes of section 9. See Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687 (1995).
 
 
 5
 Section 7(a)(2) of the ESA requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence" of any endangered or threatened species or result in the destruction of critical habitat. 16 U.S.C. §§ 1536(a)(2). The term "action" includes "all activities or programs of any kind authorized, funded, or carried out, in whole or in part, by Federal agencies," including the granting of permits. 50 C.F.R. §§ 402.02 (2000). The parties agree that issuing an incidental take permit qualifies as agency action for purposes of section 7(a)(2).
 
 
 6
 When undertaking an action, an agency (the "action agency") must determine whether the action "may affect" an endangered or threatened species. 50 C.F.R. §§ 402.14(a) (2000). If so, the agency must formally consult with either the FWS or the National Marine Fisheries Service ("NMFS") ("consultation agencies"), depending on which agency is in charge of that species. Id. During consultation the parties cannot make "any irreversible or irretrievable commitment of resources with respect to the agency action which has the effect of foreclosing the formulation or implementation of any reasonable and prudent alternative measures which would not violate" section 7(a)(2). 16 U.S.C. §§ 1536(d). After formal consultation, the appropriate consultation agency issues a Biological Opinion evaluating the potential effect on the protected species. If the consultation agency's Biological Opinion concludes that the proposed activity is likely to jeopardize an endangered or threatened species, the agency identifies reasonable and prudent alternatives to avoid the action's negative impacts. 16 U.S.C. §§ 1536(a)(2) & (b)(3)(A). If the consultation agency's Biological Opinion concludes that the proposed activity is not likely to jeopardize an endangered or threatened species, then the proposed action is permitted.
 
 
 7
 The section 7 duty to consult can be ongoing, and consultation must be reinitiated under certain circumstances. An agency is required to reinitiate consultation where
 
 
 8
 discretionary Federal involvement or control over the action has been retained or is authorized by law and:
 
 
 9
 (a) If the amount or extent of taking specified in the incidental take statement is exceeded;
 
 
 10
 (b) If new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;
 
 
 11
 (c) If the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion; or
 
 
 12
 (d) If a new species is listed or critical habitat designated that may be affected by the identified action.
 
 
 13
 50 C.F.R. §§ 402.16 (emphasis added). The duty to reinitiate consultation lies with both the action agency and the consultation agency. See id. Reinitiation of consultation requires either the FWS or the NMFS to issue a new Biological Opinion before the agency action may continue. Mt. Graham Red Squirrel v. Madigan, 954 F.2d 1441, 1451 (9th Cir. 1992).
 
 II.
 
 14
 EPIC argues that the FWS's duty to reinitiate consultation has been triggered because that agency retained discretionary involvement or control over the action permitted by Simpson's spotted owl permit, and the marbled murrelet and coho salmon, two species that may be affected by what Simpson does with its permit, have been added to the threatened species list. The marbled murrelet was added to the list in the fall of 1992, several months after the FWS issued the incidental take permit to Simpson. See 50 C.F.R. §§ 17.11(h) (2000). Close to five years later, the NMFS added the coho salmon to the threatened species list. See id. Both the marbled murrelet and coho salmon inhabit Simpson's timberland; however, it is not certain that Simpson's logging activities have had or will have a negative effect on either of them.[2]
 
 
 15
 Simpson's land is also habitat for the northern spotted owl, which the FWS listed as a threatened species in 1990. See id. When that happened, Simpson's logging activities exposed the company to potential liability under section 9 of the ESA for "taking" northern spotted owls. In order to continue its logging operation, Simpson applied for an "incidental take" permit from the FWS under section 10 of the ESA authorizing it to take some northern spotted owls provided "such taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." 16 U.S.C. §§ 1539(a)(1)(B) (1994).
 
 
 16
 As part of the application for its incidental take permit, Simpson was required to submit a Habitat Conservation Plan ("HCP")[3] and an Implementation Agreement ("IA")[4]. The HCP is an extensive document that explains "(i) the impact which will likely result from [the] taking; (ii) what steps the applicant will take to minimize and mitigate such impacts; and . . . (iv) such other measures that the Secretary may require as being necessary or appropriate for purposes of the plan." 16 U.S.C. §§ 1539(a)(2)(A) (1994). The IA outlines how the permit holder will carry out the obligations described in the HCP. These documents then become part of the application and, if the application is approved, are incorporated into the incidental take permit.
 
 
 17
 Simpson prepared an HCP detailing measures designed to minimize the impact of its logging on the spotted owl, including mitigation measures, reporting requirements, and monitoring by the FWS and state agencies. Simpson also provided research showing that these measures would ensure no significant adverse impact to the spotted owl and that its conservation program would contribute to the survival and recovery of that species. In addition, in its HCP, Simpson promised that the Timber Harvesting Plans ("THPs") it would submit to California's Department of Forestry under California law would include numerous mitigation measures. The HCP states,
 
 
 18
 In addition to addressing the specific needs of the spotted owl, Simpson's THPs [to be submitted to the California Department of Forestry] will be designed to:
 
 
 19
 Retain 50 to 70 percent canopy and 50 percent ground cover along Class I and large Class II streams;
 
 
 20
 Protect ponds, swamps, bogs, and seeps as separate riparian areas and identify them in the THP as habitat retention areas;
 
 
 21
 Protect resource values during site preparation through measures such as limitations on burning, exclusion of heavy equipment from retention areas, and construction of additional firelines (where appropriate) around retention areas;
 
 
 22
 Design, construct, and maintain roads to minimize impacts and the number of stream crossings through riparian areas;
 
 
 23
 Modify silvicultural systems as appropriate to ensure compatibility with the habitat requirements of other species found within Simpson's ownership that are considered sensitive by state and federal regulatory agencies.
 
 
 24
 These measures will benefit other species of concern as well as the owl and meet or exceed current state Forest Practice Rules.
 
 
 25
 HCP at 194-95 (emphasis added).
 
 
 26
 Because the FWS's action in issuing the incidental take permit would affect the spotted owl, it completed an internal consultation process as required by section 7(a)(2) of the ESA.[5] Then, on September 17, 1992, the FWS issued a permit to Simpson allowing it to take a limited number of northern spotted owls over a thirty-year period in the process of its logging operations. The permit does not allow Simpson to take any other species.
 
 
 27
 The FWS retained some ongoing authority over Simpson's permit: ten years after the permit's issuance, the FWS will review the permit and evaluate whether Simpson has complied with its terms before allowing Simpson to continue logging operations under the permit. The FWS can also suspend the permit at any time in the event of "any significant violation or breach" of the permit; it also has the authority to revoke the permit if activities authorized under it result in the taking of threatened species not the subject of the permit, including the marbled murrelet and coho salmon.
 
 
 28
 The district court concluded that, although a number of provisions in Simpson's permit gave the FWS "some involvement in the continuing administration of the permit, " those provisions were not sufficient to establish the discretionary federal involvement or control required for reinitiation of consultation under 50 C.F.R. §§ 402.16. The district court dismissed EPIC's suit with prejudice, and this appeal followed.
 
 III.
 
 29
 We review de novo a district court's dismissal under Rule 12(b)(6) for failure to state a claim. Williamson v. General Dynamics Corp., 208 F.3d 1144, 1149 (9th Cir. 2000). De novo review of a district court judgment concerning a decision of an administrative agency means we view the case from the same position as the district court. Nevada Land Action Ass'n v. United States Forest Serv., 8 F.3d 713, 716 (9th Cir. 1993). Judicial review of administrative decisions involving the ESA is governed by section 706 of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 706 (1994). Under the APA, a court may set aside an agency action if the court determines that action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law " or "without observance of procedure required by law." 5 U.S.C. §§ 706(2)(A) & (D); Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1125 (9th Cir. 1998).
 
 IV.
 A. Standing
 
 30
 Simpson challenges EPIC's standing to bring this suit under the citizen-suit provision of the ESA, codified at 16 U.S.C. §§ 1540(g)(1) (1994). That statute provides,
 
 
 31
 (g) Citizen suits
 
 
 32
 (1) Except as provided in paragraph (2) of this subsection any person may commence a civil suit on his own behalf
 
 
 33
 (A) to enjoin any person, including the United States and any other governmental instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution), who is alleged to be in violation of any provision of this chapter or regulation issued under the authority thereof; or
 
 
 34
 (C) against the Secretary [of Commerce or the Interior] where there is alleged a failure of the Secretary to perform any act or duty under section 1533 of this title which is not discretionary with the Secretary.
 
 
 35
 The citizen suit provision "is a means by which private parties may enforce the substantive provisions of the ESA against regulated parties--both private entities and Government agencies." Bennett v. Spear, 520 U.S. 154, 173 (1997). In the present case, EPIC is suing to enforce section 7(a)(2) of the ESA, a substantive provision that requires all federal agencies to "insure that any action authorized, funded or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification" of critical habitat of such species. 16 U.S.C. §§ 1536(a)(2).
 
 
 36
 Simpson relies on Bennett in arguing that the ESA's citizen-suit provision does not apply to suits for maladministration of the ESA and that EPIC's suit falls within this category. Simpson misreads Bennett. There, the FWS, as the consultation agency, issued a Biological Opinion allowing the Bureau of Reclamation, as the action agency, to undertake a water reclamation project subject to certain restrictions. Although the Bennett court held that the FWS could not be sued for mal-administration of the ESA under 16 U.S.C. §§ 1540(g)(1)(A), the Court expressly recognized that citizen suits are a permissible means to enforce the substantive provisions of the ESA against regulated parties--including government agencies like the FWS in its role as the action agency. See Bennett, 520 U.S. at 173. Here, EPIC seeks to enforce the substantive obligation imposed on the FWS to ensure that no action authorized by it is likely to jeopardize a threatened species. Accordingly, EPIC has standing to bring this lawsuit under the citizen-suit provision of the ESA.
 
 
 37
 Even if we were to read Bennett to preclude citizen-suit standing for EPIC under the ESA, EPIC would still have standing to sue under the APA. EPIC's complaint alleges that the FWS's failure to comply with Section 7(a)(2) of the ESA was arbitrary, capricious, and not in accordance with procedures required by law, in violation of the APA. See 5 U.S.C. §§ 706(2)(A). "When a plaintiff challenges an agency action under the APA, it must also show that the interests it seeks to protect are `arguably within the zone of interests to be protected' by the statute in question." Yesler Terrace Cmty. Council v. Cisneros, 37 F.3d 442, 445 (9th Cir. 1994) (quoting Ass'n of Data Processing Serv. Orgs., Inc. v. Camp, 397 U.S. 150, 153 (1970)). The interests EPIC seeks to protect in this litigation clearly fall within the zone of interests contemplated by section 7(a)(2) of the ESA. Section 7(a)(2) requires agencies, before authorizing action, to obtain a Biological Opinion on the environmental impact of that action in order to ensure that the action will not jeopardize a threatened species. EPIC, as a non-profit organization that seeks to protect threatened species, has a direct interest in seeing that the FWS complies with section 7(a)(2). Thus, EPIC has standing under §§ 706 of the APA, as well as under the citizen-suit provision of the ESA.
 
 B. Duty to Reinitiate Consultation
 
 38
 EPIC argues that, under the plain language of 50 C.F.R. §§ 402.16 and our decision in Pacific Rivers Council v. Thomas, 30 F.3d 1050 (9th Cir. 1994), the extent of FWS's control over Simpson's permit, combined with the subsequent listing of the coho salmon and the marbled murrelet as threatened species, is sufficient to trigger the FWS's duty to reinitiate consultation. Alternatively, EPIC argues that if we determine that Sierra Club v. Babbitt, 65 F.3d 1502 (9th Cir. 1995), not Pacific Rivers, governs this case, the FWS's discretionary power over Simpson's permit satisfies even the Sierra Club test because the FWS's discretionary control can benefit the marbled murrelet and the coho salmon.
 
 
 39
 For the reasons stated below, we conclude that Sierra Club provides the appropriate test, and under that test the FWS is not required to reinitiate consultation on Simpson's spotted owl permit.
 
 
 40
 Sierra Club involved a suit against the Bureau of Land Management ("BLM") for its failure to consult with the FWS about the effect of a proposed logging road on the northern spotted owl. A private timber company was going to build a road on public land pursuant to a right-of-way agreement with the BLM. The Sierra Club claimed that the agreement represented ongoing agency action and that the BLM was required to consult with the FWS about the potential impact of the road on a newly listed species, the spotted owl, because the BLM retained discretionary involvement and control over the rightof-way. Under the right-of-way agreement, the BLM could object to the timber company's project in three limited instances, none of which was at issue or related to endangered or threatened species. Id. at 1509 n.10. We held that the BLM did not have a duty to consult with the FWS because it could not influence construction of the roadway for the benefit of the spotted owl:
 
 
 41
 In light of the statute's plain language, the agency's regulations, and the case law construing the scope of "agency action," we conclude that where, as here, the federal agency lacks the discretion to influence the private action, consultation would be a meaningless exercise; the agency simply does not possess the ability to implement measures that inure to the benefit of the protected species.
 
 
 42
 Id. at 1509 (emphasis added).
 
 
 43
 Under Sierra Club, to survive a Rule 12(b)(6) motion to dismiss, EPIC must allege facts to show that the FWS retained sufficient discretionary involvement or control over Simpson's permit "to implement measures that inure to the benefit of the" marbled murrelet and the coho salmon. Id. Although EPIC contends its complaint satisfies the Sierra Club test, its first line of attack is to avoid that test by arguing instead that Pacific Rivers controls the outcome of this case. We disagree.
 
 
 44
 Pacific Rivers held that the Forest Service was obligated to consult with the NMFS upon its listing of the Snake River chinook salmon as threatened because the Forest Service's Land Resource Management Plans ("LRMPs"), which establish fifteen-year plans for government lands, "have an ongoing and long-lasting effect even after adoption" and therefore "represent ongoing agency action." 30 F.3d at 1053. Simpson's incidental take permit is not analogous to the LRMPs at issue in Pacific Rivers. LRMPs are comprehensive management plans which govern agency action in forest planning decisions. The Forest Service has plenary control in this area because it is the agency charged with promulgating, approving and implementing LRMPs on Forest Service land. In contrast, Simpson's ESA section 10 permit, like the right-of-way agreement in Sierra Club, involves agency authorization of a private action and a more limited role for the FWS. In such a case, the issue of ongoing agency involvement turns on whether the agency has retained the power to "implement measures that inure to the benefit of the protected species." Sierra Club, 65 F.3d at 1509. Sierra Club , not Pacific Rivers, controls the present case.
 
 
 45
 Addressing the Sierra Club test, EPIC argues that the langauge of the HCP reserves to the FWS discretionary involvement and control to such an extent that it must reconsult on the impact of Simpson's spotted owl permit on marbled murrelet and coho salmon. Most significantly, EPIC cites a passage from the HCP's section on mitigation measures captioned "Overall Resource Management." This passage states that "[i]n addition to addressing the specific needs of the spotted owl, Simpson's THPs submitted to the State of California will be designed to . . . [m]odify silvicultural systems as appropriate to ensure compatibility with the habitat requirements of other species found within Simpson's ownership that are considered sensitive by state and federal regulatory agencies." HCP at 195.
 
 
 46
 EPIC argues this assurance obligated Simpson to benefit species that might be listed as threatened after Simpson's permit was granted, including marbled murrelet and coho salmon. We disagree. The sentence in the HCP on which EPIC relies was one of numerous mitigation measures set forth in the HCP "to ensure protection of spotted owls as per state and federal laws and to mitigate and minimize, to the maximum extent practicable, the potential effects of timber harvesting on the resident owl population." Id. at 192. The most reasonable interpretation of the promise to"[m]odify silvicultural systems" is that the language means Simpson will modify silvicultural systems to accommodate other currently listed species, not species that might subsequently be listed. As the FWS points out, nowhere in the various permit documents did the FWS retain discretionary control to make new requirements to protect species that subsequently might be listed as endangered or threatened.[6]
 
 
 47
 EPIC argues the FWS's interpretation of the permit documents, and its position in this litigation, are undercut by a statement it made in its Biological Opinion Letter. A sentence in that Letter states: "Reinitiation of formal consultation is required if . . . a new species is listed or critical habitat designated that may be affected by this action." Biological Opinion Letter at 7. This statement, however, is not a statement of any continuing discretionary power retained by the FWS over Simpson's permit. It simply restates the general regulatory requirement found at 50 C.F.R. §§ 402.16, a requirement which becomes applicable only when sufficient discretionary involvement or control has been retained to trigger reinitiation of consultation. Id.
 
 
 48
 EPIC also argues that other provisions of the HCP and IA authorize the FWS to require protection for species other than owls. The provisions to which EPIC refers identify thresholds for the owl population that trigger plan modifications and corrective measures, and establish a contingency plan when thresholds are exceeded or unforeseen events occur. The provisions also allow the FWS to review corrective action to eliminate plan deficiencies, suspend the permit for significant violations or breaches of the permit, and incorporate revisions to the HCP as necessary to ensure that the conservation goals of the HCP are met. See HCP at 203-05; IA at 15-17, 22. None of these provisions addresses the scope of the FWS's authority to implement measures to benefit species other than the spotted owl.
 
 
 49
 For example, one provision of the IA allows the FWS to review annual reports and "notify Simpson of any deficiencies in the report or in permit compliance, specifying what additional information or actions are required to correct those deficiencies." IA at 15. This provision gives the FWS the ability to seek further information, to notify Simpson of noncompliance, and to provide guidance on how to cure those deficiencies. It does not give the FWS the power, however, to act to benefit marbled murrelets or coho salmon.
 
 
 50
 Similarly, the IA provision allowing the FWS to revise the contingency plan "as may be necessary to ensure that the conservation goals of the HCP are met" does not expand the conservation goals of the HCP to include reinitiation of consultation to determine the permitted activity's effects on the marbled murrelet and coho salmon. Id. at 17. Instead, it allows the FWS to revise the contingency plan to protect spotted owls "in the event of unforeseen occurrences or if the reproductive success rates [of spotted owls] fall below thresholds established" by the IA. Id. at 16. The IA also allows the FWS to suspend the permit "[i]n the event of any significant violation or breach of the Permit or this Agreement. " Id. at 22. However, as the FWS points out, "this provision authorizes remedies for breach, not discretionary power to demand additional measures to protect new species."
 
 
 51
 In sum, none of the provisions of the HCP or IA gives the FWS the power to reinitiate consultation on Simpson's spotted owl permit to impose measures to protect the marbled murrelet or coho salmon. Nevertheless, EPIC contends, relying on Natural Res. Def. Council v. Houston, 146 F.3d 1118, 1126 (9th Cir. 1998), that so long as a permitting agency maintains "some" discretionary control, it has a duty to reconsult under section 7(a)(2). EPIC argues Houston demonstrates that "existing contracts and permits that are in no way related to the ESA or do not provide mechanisms to protect threatened and endangered species may require alteration if necessary to comply with the ESA." EPIC Opening Br. at 37. We do not read Houston as supporting EPIC's argument.
 
 
 52
 In Houston, we held that the Bureau of Reclamation was required to consult with the NMFS because its renewal of water contracts, which was statutorily mandated to be on "mutually agreeable" terms with water purchasers, involved agency discretion to set the contract terms. Negotiating and executing contracts constituted "agency action. " Id. at 1125-26. The Bureau retained the requisite discretionary control because, depending on the outcome of the consultation, it had the discretionary power to decrease the total supply of water available for sale and thereby to decrease the amount of water granted in the renewed contracts. See id. at 1126. Therefore, the Bureau was required to initiate consultation if its action might affect a listed species.
 
 
 53
 We did not suggest in Houston that once the renewed contracts were executed, the agency had continuing discretion to amend them at any time to address the needs of endangered or threatened species. Houston is inapposite.
 
 
 54
 Finally, EPIC argues that 50 C.F.R. §§ 13.23(b) (2000), which allows the FWS to "amend any permit for just cause at any time during its term, upon written finding of necessity," creates the discretionary authority to impose measures for the benefit of the marbled murrelet and coho salmon.[7] This regulation, however, cannot be interpreted to give the FWS the discretion to amend an ESA section 10 permit where the agency has not otherwise retained discretion under the permit to impose such an amendment. Such an interpretation would mean that sufficient discretionary involvement or control to consider impacts on newly listed species is always reserved, making irrelevant 50 C.F.R. §§ 402.16's requirement that the duty to reinitiate consultation is contingent upon the retention of "discretionary Federal involvement or control over the action."
 
 V.
 
 55
 The fact that Simpson's spotted owl permit does not require reinitiation of consultation under section 7 of the ESA to consider the permit's effects on marbled murrelets or coho salmon does not mean that Simpson may take those species. Unless Simpson receives incidental take permits for those species, it is prohibited from taking them. See 16 U.S.C. 1538(a)(1)(B). As the district court noted, the FWS or EPIC may seek relief against Simpson under section 9 of the ESA if either the marbled murrelet or coho salmon are threatened with imminent harm by Simpson's logging activities. In such a circumstance, the FWS would have the power to revoke Simpson's permit on the ground that activities covered by the permit were being conducted in violation of the ESA. See Sierra Club, 65 F.3d at 1512 ("Congress has therefore indicated that when a wholly private action threatens imminent harm to a listed species the appropriate safeguard is through section 9, 16 U.S.C. §§ 1538, and not section 7, 16 U.S.C. §§ 1536. The ESA's citizen suit provision, 16 U.S.C. §§ 1540(g), allows private plaintiffs, like Sierra Club, to enjoin private activities that are reasonably certain to harm protected species.").
 
 VI.
 
 56
 Because the FWS has not retained discretionary control over Simpson's incidental take permit that would inure to the benefit of the marbled murrelet or the coho salmon, the FWS is not required to reinitiate consultation to consider the permit's effects on those species. The district court's judgment dismissing EPIC's lawsuit is
 
 
 57
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The FWS had filed a motion for summary judgment in which it asserted arguments which the district court commented were essentially equivalent to the arguments asserted by Simpson in its motion to dismiss.
 
 
 [2]
 In 1996 and 1997, Simpson submitted draft HCPs to the FWS and the NMFS in order to obtain incidental take permits for the marbled murrelet and the coho salmon. Those applications are pending; neither the FWS nor the NMFS has issued or denied an incidental take permit for either of those species.
 
 
 [3]
 Habitat Conservation Plan for the Northern Spotted Owl on the California Timberlands of Simpson Timber Company (Apr. 15, 1992).
 
 
 [4]
 Implementation Agreement, Simpson Timber Company Northern Spotted Owl Habitat Conservation Plan (Sept. 17, 1992).
 
 
 [5]
 In most cases another agency's actions are at issue and the question is whether that agency has a duty to consult with the FWS. Here, since the action agency is the FWS, the question is whether the FWS has a duty to consult with itself.
 
 
 [6]
 Contrary to the dissent's assertion, we do not hold that the incidental take permit must explicitly grant the FWS the power to protect marbled murrelet and coho salmon in order for reconsultation to be triggered. Instead, we hold that the permit must reserve to the FWS discretion to act to protect species in addition to the northern spotted owl. The permit does not reserve such discretion to FWS.
 
 
 [7]
 50 C.F.R. §§ 13.23, by reference to 50 C.F.R. §§ 17.32(d)(5) (2000), limits the power to amend permits issued after March 25, 1998. Because Simpson's permit was issued in 1992, these additional limitations do not apply.
 
 
 D.W. NELSON, dissenting:
 
 58
 This case concerns a federal agency's affirmative duty under Section 7 of the Endangered Species Act ("ESA"), 16 U.S.C. §§ 1536 (1994), to ensure that it is not likely to jeopardize a threatened species before acting or authorizing private action. We decide what circumstances trigger the agency's duty to consult with the Fish and Wildlife Service ("FWS") about the environmental impact of its activities. An agency must reinitiate consultation where "discretionary Federal involvement or control over the action has been retained or is authorized by law and . . . a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. §§ 402.16 (2000). In this case, FWS has substantial discretionary control over Simpson's permit and two new species have been listed that may be harmed by Simpson's activities pursuant to that permit. Moreover, FWS can exercise its discretion to benefit these species which, until now, was sufficient to trigger its duty to consult. See Sierra Club v. Babbitt, 65 F.3d 1502, 1509 (9th Cir. 1995). The majority avoids this conclusion by creating a new requirement that the agency explicitly reserve the right to implement measures to protect new species in the permit. Because its holding contradicts the plain language of the regulation, misapplies our holding in Sierra Club, and frustrates the purpose of the consultation requirement, I respectfully dissent.
 
 
 59
 The plain language of 50 C.F.R. §§ 402.16 supports EPIC's position that the only prerequisites for FWS's duty to reinitiate consultation are (1) that FWS has some discretionary control over Simpson's permit, and (2) that a new species has been listed that may be affected by the permit. The regulation does not mention any other requirements, nor does it specify that the agency's discretionary control must be of a certain nature for the consultation requirement to apply. The majority acknowledges that FWS has some discretion over Simpson's permit and no one contests that the marbled murrelet and the coho salmon may be affected by Simpson's activities authorized under the permit. Consequently, section 7 and 50 C.F.R. §§ 402.16 require FWS to determine whether either species is likely to be harmed before it continues to authorize Simpson's activities.
 
 
 60
 Even under the more demanding test outlined in Sierra Club, FWS has a duty to consult. FWS retains sufficient control over Simpson's permit that it could take steps which "inure to the benefit" of the coho salmon and the marbled murrelet. 65 F.3d at 1509. First, the Implementation Agreement ("IA") gives FWS authority to suspend Simpson's incidental take permit "[i]n the event of any significant violation or breach." IA at 22. If Simpson fails to honor its obligations, FWS can suspend the permit until appropriate remedial measures are taken. FWS's authority is not limited to protecting the northern spotted owl. Under the terms of the agreement, Simpson promised to implement a series of mitigation measures designed specifically to benefit other species. For example, Simpson's Habitat Conservation Plan ("HCP") includes commitments to retain 50 to 70 percent canopy and 50 percent ground cover along Class I and Class II streams, and to design roads that minimize the impact and number of stream crossings through riparian areas. See HCP at 194. These promises were not limited, as the majority assumes, to benefit species already listed as threatened, but were worded broadly to encompass "other species of concern." Id. Even under the majority's narrow reading of Simpson's commitment to"ensure compatibility with the habitat requirements of other species . . . that are considered sensitive by state and federal regulatory agencies," HCP at 195, the marbled murrelet is covered. The marbled murrelet was considered "sensitive" by federal and state regulatory agencies as early as June 1991, more than one year before FWS issued the permit to Simpson. See 56 Fed. Reg. 28362, 28365 (June 20, 1991).
 
 
 61
 In addition, FWS's general permitting regulations provide broad discretion for the agency to amend an incidental take permit. Under 50 C.F.R. §§ 13.23, FWS "reserves the right to amend any permit for just cause at any time during its term, upon written finding of necessity."[1] This clause was incorporated into Simpson's permit and overrides any agreement to the contrary.[2] If FWS determines that Simpson's Timber Harvesting Plans ("THPs") may jeopardize the marbled murrelet or coho salmon, FWS would have just cause to amend the permit to include stronger mitigation measures. These sources of discretion, together with the promises made by Simpson in its HCP, provide sufficient remedial authority for FWS to implement measures that inure to the benefit of the marbled murrelet and coho salmon. Thus, unlike Sierra Club, consultation would not be a meaningless exercise. In Sierra Club, the Bureau of Land Management's discretionary authority was far more limited and had no connection to the newly listed species. The right of way agreement in that case gave the BLM authority to halt construction under very narrow circumstances, whereas the Implementation Agreement specifically delegates discretion to FWS to suspend the permit for any significant breach. Moreover, the BLM's permitting regulations do not have an equivalent clause allowing it to amend its right-of-way agreements for just cause.[3]
 
 
 62
 In contrast, FWS has authority to review Simpson's activities for compliance with the promises made in its HCP and can order Simpson to fulfill its obligations under the permit. Simpson promised to submit THPs that include resource management techniques designed to protect "other species of concern." If Simpson fails to take into account the habitat requirements of the coho salmon and the marbled murrelet, FWS can suspend its permit until Simpson takes remedial measures. Had Sierra Club involved a similar promise to design the logging road so as to minimize damage to other species of concern, we certainly would have found there to be sufficient discretion to trigger the duty to consult.
 
 
 63
 Because FWS retains power to amend Simpson's permit for just cause or suspend the permit if Simpson does not design its timber harvesting in such a way as to mitigate damage to other threatened species, consultation could obviously lead to measures that benefit the coho salmon or marbled murrelet. Under these circumstances, FWS is obligated to reinitiate the consultation process in order to fulfill its duties under section 7 of the ESA. Therefore, FWS's failure to reinitiate formal consultation violates the APA because the agency has acted without observance of the procedure required by law. See 5 U.S.C. §§ 706(2)(A).
 
 
 64
 The majority holds instead that FWS's discretion is insufficient to trigger its duty to consult because the permit does not authorize FWS specifically to act for the benefit of the marbled murrelet and the coho salmon. In other words, since the permit does not explicitly give FWS the power to implement measures to protect these two species, the agency is powerless to require measures that inure to their benefit. The majority effectively reads a new requirement into the regulation. Even as interpreted in Sierra Club, 50 C.F.R.§§ 402.16 does not require the parties to anticipate the specific purpose for which discretion may be exercised in order for there to be sufficient discretionary control that it can benefit a newly listed species.
 
 
 65
 The majority appears to be concerned about whether Simpson had sufficient notice that FWS might exercise its discretion for the benefit of newly listed species. This concern obscures the purpose behind the consultation requirement. Whereas section 9 of the ESA makes it unlawful for anyone to "take" an endangered species, 16 U.S.C. 1538(a)(1)(B), section 7 requires all federal agencies to "insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence " of any threatened species. 16 U.S.C. 1536(a)(2). Thus, section 7 imposes a separate, affirmative duty on federal agencies to make sure, before they act, that they will not harm listed species. Simpson's expectations are irrelevant to whether FWS's procedural obligation has been triggered. The majority's failure to appreciate the unique duty created by section 7 is evident in its discussion of alternative remedies available to EPIC. The fact that Section 9 provides recourse against Simpson after it takes marbled murrelet is beside the point. EPIC brings this case now against FWS because it should not have to wait until Simpson takes a listed species to enforce FWS's duty under the Act.
 
 
 66
 In any case, Simpson had sufficient notice based on the plain language of the regulation and its own commitments in the permit application. Simpson's HCP included promises that would clearly appeal to FWS regulators. By promising not only to mitigate harm to the spotted owl, but other species of concern as well, Simpson made its application more attractive. And Simpson received a substantial benefit in exchange for these promises--the right to take northern spotted owls without running afoul of the ESA. Simpson accepted its permit subject to certain background conditions, one of which imposes an ongoing duty on FWS to insure that its actions do not jeopardize threatened species. We cannot ignore those provisions without in some way violating the bargain. To hold otherwise would rewrite the permit and give a windfall to Simpson in the form of extra assurances that were not bargained for in the original agreement.
 
 
 
 Notes:
 
 
 [1]
 50 C.F.R. §§ 13.23 was amended in August 2000 to limit FWS's discretion over certain permits. The new regulation reads:"The Service reserves the right to amend any permit for just cause at any time during its term, upon written finding of necessity, provided that any such amendment of a permit issued under §§ 17.22(b) through (d) or §§ 17.32(b) through (d) of this subchapter shall be consistent with the requirements of §§ 17.22(b)(5), (c)(5) and (d)(5) or §§ 17.32(b)(5), (c)(5) and (d)(5) of this subchapter, respectively." Simpson's permit was issued under§§ 17.32(b). Consequently, the permit would be protected from amendment under the assurances provided in §§ 17.32(b)(5), however, that section expressly excludes permits issued before March 25, 1998. Because Simpson's permit was issued in 1992, when no such assurances were provided under FWS's governing regulations, compare 50 Fed. Reg. 39681 (Sept. 30, 1985), with 63 Fed. Reg. 8859 (Feb. 23, 1998) (amending regulations to include Habitat Conservation Plan Assurances ("No Surprises") Rule), FWS is not restricted by the current version of the regulations from amending Simpson's permit for just cause upon a written finding of necessity.
 
 
 [2]
 The Implementation Agreement states: "nothing herein contained is intended to limit the authority or responsibility of the United States government to . . . otherwise fulfill its responsibilities under the ESA."
 
 
 [3]
 We also deferred, in Sierra Club, to the Solicitor's interpretation that BLM did not have a duty to consult. 65 F.3d at 1506, 1509. Here there is no such agency interpretation entitled to deference.