M. SMITH, Circuit Judge,
with whom KOZINSKI, Chief Judge, joins, and with whom IKUTA and MURGUIA, Circuit Judges,
join as to Parts I through VI, dissenting:
*1031 [[Image here]]

I attempted to rise, but was not able to stir: for, as I happened to lie on my back, I found my arms and legs were strongly fastened on each side to the ground; and my hair, which was long and thick, tied down in the same manner. I likeivise felt several slender ligatures across my body, from my arm-pits to my thighs. I could only look upwards; the sun began to groio hot, and the light offended my eyes.

—Jonathan Swift, Gulliver’s Travels, Chapter 1.
Here we go again.
Until today, it was well-established that a regulatory agency’s “ ‘inaction’ is not ‘action’ ” that triggers the Endangered Species Act’s (ESA) arduous interagency consultation process. W. Watersheds Project v. Matejko, 468 F.3d 1099, 1108 (9th Cir.2006). Yet the majority now flouts this crystal-clear and common sense precedent, and for the first time holds that an agency’s decision not to act forces it into a bureaucratic morass.
In my view, decisions such as this one, and some other environmental cases recently handed down by our court (see Part VII, infra), undermine the rule of law, and make poor Gulliver’s situation seem fortunate when compared to the plight of those entangled in the ligatures of new rules created out of thin air by such decisions.
*1032 I. Mining in national forests
The right to mine on national lands is established by the Mining Act of 1872, 30 U.S.C. § 21 et seq.:
Under the provisions of the Mining Act, an individual may enter and explore land in the public domain in search of valuable mineral deposits. After minerals are discovered, the claimant may file a “mining claim” with the Bureau of Land Management (BLM), which if approved, entitles the claimant to the right of exclusive possession of that claim, as long as the requirements of the Mining Act are met. Although ownership of a mining claim does not confer fee title to the claimant, the claimant does have the right to extract all minerals from the claim without paying royalties to the United States.
Swanson v. Babbitt, 3 F.3d 1348, 1350 (9th Cir.1993).
The Mining Act’s permissive regime extends to national forests as well. The 1897 act that created the national forests and provided rules governing those forests’ use, see Organic Administration Act, 16 U.S.C. §§ 473-78, emphasized that its provisions do not “prohibit any person from entering upon such national forests for all proper and lawful purposes, including that of prospecting, locating, and developing the mineral resources thereof. Such persons must comply with the rules and regulations covering such national forests.” 16 U.S.C. § 478.
When the U.S. Forest Service issued the mining regulations at issue in this case, the Service emphasized “that prospectors and miners have a statutory right, not mere privilege, under the 1872 mining law and the Act of June 4,1897, to go upon and use the open public domain lands of the National Forest System for the purposes of mineral exploration, development and production.” National Forests Surface Use Under U.S. Mining Laws, 39 Fed.Reg. 31,-317, at 31,317 (Aug. 28, 1974) (emphasis added).
II. The regulatory scheme
This case turns on whether a Forest Service District Ranger’s receipt of, consideration of, and response to a miner’s notice of intention to operate — a Notice of Intent — is an agency action that authorizes mining activities on national forests. This distinction is critical because the ESA requires federal agencies to consult with the Fish and Wildlife Service or NOAA Fisheries Service before taking “any action authorized, funded, or carried out by such agency” that might harm a listed species. 16 U.S.C. § 1536(a)(2).
The ESA’s implementing regulations (promulgated by the Secretaries of Commerce and the Interior) offer a list of examples of agency action, including (in relevant part) “the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid.” 50 C.F.R. § 402.02 (2004).
In this appeal, Plaintiff-Appellant asserts a single claim challenging the District Ranger’s failure to consult with the Fish and Wildlife Service or NOAA Fisheries Service when deciding to allow certain suction dredge mining to proceed under a Notice of Intent rather than a Plan of Operations. The dispute here is narrow: specifically, does the Forest IK Service’s handling of Notices of Intent constitute an “authorization” of private mining activity under the ESA?
To answer this question, one must have a clear understanding of the operative regulations. In recognition of the “statutory right, not mere privilege” to mine in national forests, the Forest Service has carefully tailored its regulations to balance environmental goals with miners’ unique preexisting rights of access to national forests. See National Forests Surface Use, 39 Fed. *1033 Reg. 31,317 (Aug. 28,1974). These regulations apply only to mining activities on Forest Service lands. 36 C.F.R. § 228.2 (2004).[1]
All mining “operations” must “be conducted so as, where feasible, to minimize adverse environmental impacts on National Forest surface resources.” Id. § 228.8(e); see also id. § 228.3(a) (defining “operations” broadly for purposes of these regulations). This environmental-impact provision requires compliance with federal air and water quality standards, as well as (among other things) the use of “all practicable measures to maintain and protect fisheries and wildlife habitat which may be affected by the operations.” Id. § 228.8. Forest Service officials must “periodically inspect operations to determine if the operator is complying with the[se] regulations,” and inform non-compliant miners how to bring their activities into compliance. Id. § 228.7.
In addition to these generally applicable limitations on mining in the national forests, the Forest Service imposes additional requirements depending on the mining activities’ potential environmental impact. For purposes of these additional requirements, mining activities are divided into three categories: activities that “will not,” “might,” and “will likely” lead to “significant disturbance of surface resources.” Id. § 228.4(a), (a)(l)(v).
For activities that “will not” significantly disturb surface resources-including “occasionally remov[ing] small mineral samples or specimens,” and “remov[ing] ... a reasonable amount of mineral deposit for analysis and study” — persons may freely enter the national forest to conduct those activities. Id. § 228.4(a)(1), (a)(2)(h), (a)(2)(iii).
For more substantial mining activities that “might” or “will likely” cause resource disturbance, miners must file a “notice of intention to operate” — a Notice of Intent, which is the focus of this appeal. Id. § 228.4(a).[2] The Notice of Intent is a straightforward document, requiring miners to list: (1) the name, address, and telephone number of the operator; (2) the area involved; (3) the nature of the proposed operations; (4) the route of access to the area; and (5) the method of transport to be used. U.S. Forest Serv., Notice of Intent Instructions: 36 CFR 2284(a)— Locatable Minerals, http://www.fs.usda. gov/Internet/FSE_DOCUMENTS/fsm9_ 020952.pdf (last visited May 4, 2012); see also 36 C.F.R. § 228.4(a)(2)(iii) (2004).
Once “a notice of intent is filed, the District Ranger will, within 15 days of receipt thereof, notify the operator whether a plan of operations is required.” 36 C.F.R. § 228.4(a)(2)(iii) (2004). A Plan of Operations is required if the proposed mining activities “will likely” cause significant surface resource disturbance. Id. § 228.4(a). In contrast, if “significant disturbance is not likely,” then a Plan of Operations “is not required.” Siskiyou Reg’l Educ. Project v. U.S. Forest Serv., 565 F.3d 545, 557 (9th Cir.2009) (emphasis in original). “[MJining activity that might cause disturbance of surface resources, yet [is] not likely to do so ... require[s] only a notice of intent under 36 C.F.R. § 228.4(a).” Id. (emphasis in original).
If the District Ranger requests a Plan of Operations, the Plan must contain “[information sufficient to describe or identify the *1034 type of operations proposed and how they would be conducted, the type and standard of existing and proposed roads or access routes, the means of transportation used ..., the period during which the proposed activity will take place, and measures to be taken to meet the requirements for environmental protection in § 228.8.” 36 C.F.R. § 228.4(c)(3) (2004). The District Ranger must “complet[e] ... an environmental analysis in connection with each proposed operating plan,” id. § 228.4(f), and within thirty days of submission (or ninety days if necessary), either “approve[ ] the plan” or “[njotify the operator of any changes in, or additions to, the plan of operations deemed necessary to meet the purpose of the regulations in this part.” Id. § 228.5(a)(1), (3).[3]
III. Forest Service’s interpretation of its regulations
The majority asserts that the Forest Service’s decision not to require a Plan of Action for the mining activities described in a Notice of Intent constitutes an implicit authorization of those mining activities, therefore equating the Forest Service’s “decision” with an agency “authorization” under the ESA.
The Forest Service never contemplated such a result. The Forest Service’s explanation of its mining regulations establishes that a Notice of Intent is used as an information-gathering tool, not an application for a mining permit. Consistent with the Forest Service’s interpretations, the Ranger’s response to a Notice of Intent is analogous to the Notice of Intent itself, and provides merely notice of the agency’s review decision. It is not a permit, and does not impose regulations on private conduct as does a Plan of Operations. The Forest Service interprets the Notice of Intent as an information-gathering tool used to decide whether a miner should file a Plan of Operations:
[T]he requirement for prior submission of a notice of intent to operate alerts the Forest Service that an operator proposes to conduct mining operations on [National Forest Service] lands which the operator believes might, but are not likely to, cause significant disturbance of [National Forest Service] surface resources and gives the Forest Service the opportunity to determine whether the agency agrees with that assessment such that the Forest Service will not exercise its discretion to regulate those operations.
Clarification as to When a Notice of Intent To Operate and/or Plan of Operation Is Needed for Locatable Mineral Operations on National Forest System Lands, 70 Fed. Reg. 32,713, at 32,720 (June 6, 2005) (emphasis added).[4]
The Forest Service adds that the Notice of Intent process was designed to be “a simple notification procedure ” that would
“assist prospectors in determining whether their operations would or would not require the filing of an operating plan. Needless uncertainties and expense in time and money in filing unnecessary operating plans could be avoided thereby.... [The 1974 notice-and-comment rulemaking] record makes it clear that a notice of intent to operate was not intended to be a regulatory instrument; *1035 it simply was meant to be a notice given to the Forest Service by an operator which describes the operator’s plan to conduct operations on [National Forest Service] lands. Further, this record demonstrates that the intended trigger for a notice of intent to operate is reasonable uncertainty on the part of the operator as to the significance of the potential effects of the proposed operations. In such a circumstance, the early alert provided by a notice of intent to operate would advance the interests of both the Forest Service and the operator by facilitating resolution of the question, ‘Is submission and approval of a plan of operations required before the operator can commence proposed operations?’ ”
Id. at 32,728 (emphasis added).
Under the Forest Service’s regulations, a Notice of Intent is exactly what its name implies: a notice from the miner, not a permit or license issued by the agency. It is merely a precautionary agency notification procedure, which is at most a preliminary step prior to agency action being taken.
IV. Precedent distinguishing “action” from “inaction”
Our precedent establishes that there is a significant difference between a decision not to act and an affirmative authorization. These cases distinguish between “agency action” and “agency inaction,” and illustrate the meaning of the operative regulation’s reference to “licenses,” “permits,” and the like. 50 C.F.R. § 402.02 (2004). In the pertinent cases involving “agency action,” the agency takes an affirmative step that allows private conduct to take place; without the agency’s affirmative action (such as issuing a permit, license, or contract), the private conduct could not occur.[5] In the pertinent cases involving agency inaction, private conduct may take place until the agency takes affirmative steps to intervene. The relevant case law requires us to identify the default position: if the agency does nothing, can the private activity take place? If the activity can proceed regardless of whether the agency takes any actions, then the activity does not involve the agency’s “granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid” as required for “agency action” under the regulations. Id.
Western Watersheds Project involved the BLM’s regulation (or, more accurately, non-regulation) of private parties’ diversions of water that were done pursuant to those parties’ pre-existing rights-of-way. 468 F.3d at 1103. Similar to this case, nineteenth-century federal laws recognized those rights-of-way, id. at 1103-04, but the BLM retained the power to regulate diversions that were more than “ ‘substantial deviation^]’ ” from prior uses, id. at 1109 (quoting 43 C.F.R. § 2803.2(b) (2004) (promulgated in 1986)). We assumed that the BLM had the power to regulate the diversions in dispute, and held that the BLM’s failure to exercise this power was not an “agency action” triggering ESA consultation obligations. Id. at 1108-09. We explained that agency “ ‘inaction’ is not ‘action’ for section 7(a)(2) purposes.” Id. at 1108. “[T]he BLM did not fund the diversions, it did not issue permits, it did not grant contracts, it did not build dams, nor did it divert streams.” Id. at 1109 (emphasis in original). Rather, the BLM made a *1036 decision not to regulate, which was not “agency action” under the ESA. We explained that “the duty to consult is triggered by affirmative actions.” Id. at 1102; see also Marbled Murrelet v. Babbitt, 83 F.3d 1068, 1070 (9th Cir.1996) (“Protection of endangered species would not be enhanced by a rule which would require a federal agency to perform the burdensome procedural tasks mandated by section 7 simply because it advised or consulted with a private party.”); Cal. Sportfishing Protection Alliance v. FERC, 472 F.3d 593, 595, 598 (9th Cir.2006) (holding that “the agency[ ] ha[d] proposed no affirmative act that would trigger the consultation requirement” for operations of a hydroelectric plant that were authorized by an earlier and ongoing permit, even though the agency was empowered to “unilaterally institute proceedings to amend the license if it so chose”). Predictably, the majority relegates discussion of this precedent to a brief citation and entirely fails to distinguish it from this case. Moreover, the majority does not point to a single opinion in which any court has held that such inaction triggers the ESA’s consultation requirements.
Granted, Western Watersheds Project addressed both prongs of the ESA’s “agency action” requirement: first, whether there is agency action as defined in 50 C.F.R. § 402.02, and second, whether that agency action is “discretionary,” 50 C.F.R. § 402.03. Here, I address only the “action” requirement, because the agency has discretion when deciding whether or not to act. But the regulations and case law show that these two requirements — action and discretion — are conjunctive, not disjunctive. If the agency has discretion to act but decides not to act, then there is no agency action under the ESA.
An almost identical regulatory scheme was at issue in Sierra Club v. Penfold, 857 F.2d 1307 (9th Cir.1988). Under 43 C.F.R. § 3809 (1986), the BLM uses a three-tiered approach to regulating placer mining on federal lands within its jurisdiction. First are “casual” use mines, for which no notice or approval is required. 857 F.2d at 1309. Second are “notice” mines, for which no BLM approval is required but for which the miner must submit basic information to the BLM about the proposed operations at least fifteen days prior to commencing them. Id. BLM monitors “casual” and “notice” mining operations for compliance. Id. at 1310. Third are “plan” mines, which must be approved by the BLM and subjected to environmental assessment before the operation may proceed. Id. at 1309.
The BLM’s approach to “casual,” “notice,” and “plan” mining operations follows the same structure as the Forest Service’s approach to mining activities that “are not likely to,” “might,” and “are likely to” cause significant surface resource disturbance. See 36 C.F.R. § 228.4. This similarity was intentional. 45 Fed.Reg. 78,906 (Nov. 26, 1980) (explaining that the regulations were designed “to be as consistent as possible with the Forest Service regulations”).
At issue in Penfold was whether the BLM’s approval of Notice mines is a “major Federal action.” Such a finding would trigger the National Environmental Policy Act’s (NEPA) requirement that the BLM file an environmental impact statement. We held that the approval was not a major Federal action. 857 F.2d at 1314. Pen-fold can be read to say that the BLM’s review of a notice is a “marginal” agency action, just not a “major” one. See id. at 1313-14. But just as actions must be “major” to trigger NEPA obligations, actions carried out entirely by private parties must involve “affirmative” federal agency authorization to trigger section 7’s consultation requirement. The mere fact that *1037 the agency is involved in some way is not enough. Thus, even assuming the Tribe is correct that the threshold for triggering environmental compliance under the ESA is lower than for NEPA, I nonetheless find our previous determination that a similar notice scheme was not the sort of agency action that requires environmental compliance to be additional persuasive authority in support of the district court’s holding.
I emphasize the narrowness of the question before us; I do not argue that every Forest Service “decision” is exempted from ESA consultation. The Forest Service’s mining regulations are clearly distinguishable from the Forest Service’s other regulatory activities. For example, the Forest Service must consult under the ESA when it creates and implements Land and Resource Management Plans, which govern “every individual project” in each national forest. Pac. Rivers Council v. Thomas, 30 F.3d 1050, 1053 (9th Cir.1994). In addition, the Forest Service’s negotiation and execution of timber-sale contracts, 16 U.S.C. § 472a(a); 36 C.F.R. § 223.1 (2011), is undoubtedly an agency “author-iz[ation]” that requires ESA consultation. See 50 C.F.R. § 402.02 (2004) (agency actions include “granting of ... contracts”); see also Nw. Forest Res. Council v. Pilchuck Audubon Soc’y, 97 F.3d 1161, 1167 (9th Cir.1996) (noting that Forest Service consulted with Fish and Wildlife Service regarding timber sales’ effect on marbled murrelets). The same is true for the Forest Service’s construction of roads in the national forest. Thomas v. Peterson, 753 F.2d 754, 763-64 (9th Cir.1985). Likewise, “all grazing and livestock use on National Forest System lands and on other lands under Forest Service control must be authorized by a grazing or livestock use permit.” 36 C.F.R. § 222.3 (2011). The Forest Service’s grant and oversight of such permits is undeniably “agency action” subject to the ESA consultation requirement. See Forest Guardians v. Johanns, 450 F.3d 455, 457-58, 463 (9th Cir.2006).
But here, Notices of Intent are not permits, contracts, or plans issued by the Forest Service. They are mere notifications about miners’ activities. Certainly, the Forest Service retains discretion to require miners to submit a Plan of Operations under appropriate circumstances. That was the conclusion reached in a recent Administrative Procedures Act decision, Siskiyou Regional Education Project v. U.S. Forest Service: “determining which operations are likely to cause significant disturbance of surface resources — and therefore require a plan of operations— requires a discretionary determination by a district ranger.” 565 F.3d at 557 (emphasis omitted). But the Forest Service’s decision not to require a Plan of Operations is simply not an “authorization” as defined by the statute and regulations. The majority’s proposed new category of agency conduct — implicit agency action— finds little support in the statutes, regulations, and case law.
The district court’s opinion in this case follows naturally from Western Watersheds Project. Although the majority characterizes the Forest Service’s response to a Notice of Intent as an “approval,” an “authorization,” and a “rejection,” the relevant regulations show that the Forest Service is not approving, authorizing, or rejecting anything. It is receiving and analyzing information, and deciding not to take further action.
V. Subjective views of the parties
The majority relies heavily on the fact that the District Ranger and the miners in this case understood the Notice of Intent to be an “authorization.”
At first glance, this case-specific reasoning may be enticing: after all, the miners sought the Ranger’s “approvfal]” and the *1038 Ranger “authoriz[ed]” their activities. But this path of reasoning is full of legal -obstacles, any one of which should be dispositive of the ultimate legal question under the ESA.
First, a similar argument was considered and rejected in Sierra Club v. Babbitt, 65 F.3d 1502 (9th Cir.1995), where we held that the BLM’s letter purporting to “approv[e]” a construction project could not “be construed as an authorization within the meaning of [ESA] section 7(a)(2)” because the BLM’s letter did not otherwise satisfy the statutory criteria of an ESA authorization. Id. at 1511.
Second, we are not bound by litigants’ concessions of law (even assuming that the miners’ and Ranger’s letters can be deemed “concessions”). E.g., United States v. Ogles, 440 F.3d 1095, 1099 (9th Cir.2006) (en banc).
Third, the District Ranger has no authority to interpret the ESA or its implementing regulations, so his use of the term “authorization” cannot reasonably be read as an interpretation of the ESA regulations, 50 C.F.R. §§ 402.02-03 (2004).[6] See generally Robertson, 490 U.S. at 359, 109 S.Ct. 1835 (discussing deference owed to agency’s interpretation of its regulations); Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843-45, 104 5.Ct. 2778, 81 L.Ed.2d 694 (1984).
Fourth — as even the Plaintiffs-Appellants recognize — the question of whether an agency’s course of conduct constitutes an “agency action” under the ESA is a legal question, not a factual one. Nat’l Wildlife Fed’n v. Brownlee, 402 F.Supp.2d 1, 11 (D.D.C.2005).
Finally, to understand why the parties’ conduct in this case cannot control our application of the ESA and its regulations, consider the implications of such a holding. A single District Ranger would be subjected to the ESA consultation process because he used the word “authorize” when responding to a Notice of Intent. However, no other District Ranger in the country would be subjected to the ESA under similar circumstances, even though those District Rangers operate under the same Forest Service regulations governing Notices of Intent. It goes without saying that this result makes little, if any, sense as an application of our national environmental protection laws.
VI. Discussions between miners and district rangers
The majority also relies on the fact that informal discussions take place between miners and district rangers regarding how the miners can modify their proposed activities to avoid triggering the obligation to prepare a Plan of Operations. For instance, a ranger may advise miners how to change their plans in a way that will avoid causing significant surface resource disturbances. If the miners do so, and describe their appropriately modified activities in Notices of Intent, the regulations do not require anything further; the miners are authorized to proceed with their mining activities under the General Mining Law.
The majority mistakenly attempts to characterize such informal discussions as the Forest Service’s exercise of discretion to approve or deny an NOI. But we have long held that these sorts of informal, voluntary discussions do not constitute an *1039 agency action. Marbled Murrelet v. Babbitt, 83 F.3d 1068 (9th Cir.1996). Marbled Murrelet is directly on point. In that case, we held that a joint letter from U.S. Forest Service and the California Department of Fish and Game to a timber company describing “specific conditions that must be followed to ... avoid ‘take’ of the identified species under the ESA” was “merely providing] advice” that did not trigger section 7 consultation under the ESA. Id. at 1074. As we explained, “[protection of endangered species would not be enhanced by a rule which would require a federal agency to perform the burdensome procedural tasks mandated by section 7 simply because it advised or consulted with a private party. Such a rule would be a disincentive for the agency to give such advice or consultation.” Id.
The majority takes exactly that step here. In holding that a miner’s submission of an NOI triggers section 7 consultation under the ESA, the majority discourages miners from discussing their proposed activities with the Forest Service to voluntarily reduce their impact on the environment, and rather encourages miners to make their own determination that their activities are not likely to “cause significant disturbance of surface resources,” 36 C.F.R. § 228.4(a), and thus no NOI need be filed.
VII. Brave New World

Abandon all hope, ye who enter here.

—Dante Alighieri, The Divine Comedy, Inferno Canto III
I cannot conclude my dissent without considering the impact of the majority’s decision- in this case, and others like it, which, in my view, flout our precedents and undermine the rule of law. In doing so, I intend no personal disrespect or offense to any of my colleagues. My intent is solely to illuminate the downside of our actions in such environmental cases.
By rendering the Forest Service impotent to meaningfully address low impact mining, the majority effectively shuts down the entire suction dredge mining industry in the states within our jurisdiction. The informal Notice of Intent process allows projects to proceed within a few weeks. In contrast, ESA interagency consultation requires a formal biological assessment and conferences, and can delay projects for months or years. Although the ESA generally requires agencies to complete consultations within ninety days, 16 U.S.C. § 1536(b), the agencies frequently miss their deadlines due to personnel shortages. One study found that nearly 40 percent of U.S. Fish and Wildlife Service ESA consultations were untimely, with some taking two or three years. Government Accountability Office, More Federal Management Attention is Needed to Improve the Consultation Process, March 2004. Moreover, formal consultation comes at great costs to the private applicants, often requiring them to hire outside experts because the agency is backlogged. Id. Most miners affected by this decision will have neither the resources nor the patience to pursue a consultation with the EPA; they will simply give up, and curse the Ninth Circuit.
As a result, a number of people will lose their jobs and the businesses that have invested in the equipment used in the relevant mining activities will lose much of their value. In 2008, California issued about 3,500 permits for such mining, and 18 percent of those miners received “a significant portion of income” from the dredging. See Justin Scheck, California Sifts Gold Claims, The Wall Street Journal, April 29, 2012. The gold mining operation in this case, the New 49’ers, organizes recreational weekend gold-mining excursions. The majority’s opinion effectively forces these people to await the lengthy and costly ESA consultation pro *1040 cess if they wish to pursue their mining activities, or simply ignore the process, at their peril.
Unfortunately, this is not the first time our court has broken from decades of precedent and created burdensome, entangling environmental regulations out of the vapors. In one of the most extreme recent examples, our court held that timber companies must obtain Environmental Protection Agency permits for stormwater runoff that flows from primary logging roads into systems of ditches, culverts, and channels. Nw. Envtl. Def. Ctr. v. Brown, 640 F.3d 1063 (9th Cir.2011). In the nearly four decades since the Clean Water Act was enacted, no court or government agency had ever imposed such a requirement. Indeed, the EPA promulgated regulations that explicitly exempted logging from this arduous permitting requirement. Id. at 1073. Yet our court decided to disregard the regulation and require the permits.
The result? The imminent decimation of what remains of the Northwest timber industry. The American Loggers Council estimates that the decision, if implemented, will result in up to three million more permit applications nationwide. The timber industry is not the only group criticizing Brown. Three of Oregon’s leading politicians quickly attacked the ruling. Oregon U.S. Senator Ron Wyden predicted that this opinion “would shut down forestry on private, state and tribal lands by subjecting it to the same, endless cycle of litigation.” Oregon Congressman Kurt Schrader called the opinion a “bad decision” that would create “another layer of unnecessary bureaucracy.” Oregon Governor John Kitzhaber branded the opinion as “legally flawed.”
Oregon political leaders have good reason to be concerned about the impact of our rulings on logging. Decades of court injunctions already have battered the state’s timber industry, once a dominant employer that paid excellent wages. In the 1970s and 1980s, the wood product industry employed more than 70,000 Oregonians and paid 30 percent more than the state average wage. Now, the industry employs 25,000 people and pays the state average wage. Josh Lehner, Historical Look at Oregon’s Wood Product Industry, Oregon Office of Economic Analysis, Jan. 23, 2012, available at http://oregonecono mieanalysis.wordpress.com/2012/01/23/ historical-look-at-oregons-wood-product-industry/ (last visited May 4, 2012). Requiring millions of burdensome new permits will only accelerate the decline.
Brown also profoundly harms rural local governments. Because counties receive twenty-five percent of the revenues from timber harvests on federal land, the decrease in logging has caused shorter school days, smaller police forces, and closures of public libraries. Moreover, Brown subjects rural counties to the burdensome permitting requirement if their roads are used for logging. The Association of Oregon Counties estimates that the decision will increase planning costs to Oregon counties by $56 million.
More recently, a panel majority of our court handed down Pacific Rivers Council v. United States Forest Service, 668 F.3d 609 (9th Cir.2012). The Forest Service spent years developing a forest management plan for 11.5 million acres of national forest land in the Sierra Nevada. We overturned that plan, holding that the Forest Service’s programmatic environmental impact statement must “analyze environmental consequences of a proposed plan as soon as it is ‘reasonably possible’ to do so.” Id. at 623. This conflicts with our longstanding rule that “NEPA requires a full evaluation of site-specific impacts only when a ‘critical decision’ has been made to act on site development — i.e., when ‘the agency proposes to make an irreversible and irretrievable commitment of the avail *1041 ability of resources to [a] project at a particular site.’ ” Friends of Yosemite Valley v. Norton, 348 F.3d 789, 801 (9th Cir.2003) (quoting California v. Block, 690 F.2d 753, 761 (9th Cir.1982)). Pacific Rivers Council’s de facto reversal of well-established precedent will dramatically impede any future logging in the West. Because environmental agencies will never be certain whether the unclear “reasonably possible” standard applies, it will take even longer for the agencies to approve forest plans.
Farmers, too, have suffered, and will continue to suffer, from the impact of similarly extreme environmental decisions. The Central Valley Project Improvement Act, Pub.L. No. 102-575, 106 Stat. 4600 (1992), requires that 800,000 acre feet of water in California’s Central Valley Project be designated for “the primary purpose of implementing the fish, wildlife, and habitat restoration purposes and measures[.]” In San Luis & Delta-Mendota Water Authority v. United States, 672 F.3d 676 (9th Cir.2012), the majority inexplicably read this requirement to mean that water counts toward that yield only if it “predominantly contributes to one of the primary purpose programs.” Id. at 697. This interpretation has absolutely no basis in the statutory text. The practical impact of this decision is that there will be less, perhaps far less, water for irrigation in the San Joaquin Valley’s $20 billion crop industry. Id. at 715-16 (M. Smith, J., dissenting). The region’s farms and communities, and the thousands of people employed there, already have suffered because of the lack of water, with approximately 250,000 acres of farmland now lying fallow, and unemployment ranging between 20 percent and 40 percent. Id.
No legislature or regulatory agency would enact sweeping rules that create such economic chaos, shutter entire industries, and cause thousands of people to lose their jobs. That is because the legislative and executive branches are directly accountable to the people through elections, and its members know they would be removed swiftly from office were they to enact such rules. In contrast, in order to preserve the vitally important principle of judicial independence, we are not politically accountable. However, because of our lack of public accountability, our job is constitutionally confined to interpreting laws, not creating them out of whole cloth. Unfortunately, I believe the record is clear that our court has strayed with lamentable frequency from its constitutionally limited role (as illustrated supra) when it comes to construing environmental law. When we do so, I fear that we undermine public support for the independence of the judiciary, and cause many to despair of the promise of the rule of law.[7]
I respectfully dissent.

. Because the challenged Notice of Intent decisions were made in 2004, I rely upon the 2004 version of the regulation.

. For purposes of this dissent, it is unnecessary to resolve whether suction dredge mining “may affect” Coho salmon. My primary disagreement with the majority stems from its finding of an agency "action.”

. In some cases, the District Ranger will inform the miner that a Plan of Operations is unnecessary, id. § 228.5(a)(2), or require the filing of an environmental statement with the Council on Environmental Quality, id. § 228.5(a)(5).

. I rely on the Forest Service’s 2005 clarification of its mining rules because this document contains the clearest and most thorough explanation of the history and application of these regulations. The 2005 clarification did not materially change the operative provisions. 70 Fed.Reg. at 32,727-28.

. For example, Turtle Island Restoration Network v. National Marine Fisheries Service, 340 F.3d 969 (9th Cir.2003), involved an agency’s issuance of permits to fishing vessels. The operative statutory regime "require[d] United States vessels to obtain permits to engage in fishing operations on the high seas.Id. at 973 (emphasis added). In other words, absent an agency permit, the vessels could not undertake their fishing operations.

. Regulatory authority under the ESA is delegated to the Departments of Interior and Commerce, see Nat'l Ass’n of Home Builders v. Defenders of Wildlife, 551 U.S. 644, 651, 664-65, 127 S.Ct. 2518, 168 L.Ed.2d 467 (2007), whereas the Forest Service is a part of the Department of Agriculture, see U.S. Forest Service, "U.S. Forest Service History: Agency Organization," http://www.foresthistory.org/ ASPNET/Policy/Agency_Organization/index. aspx (last visited May 4, 2012).

. ‘‘[RJepeated and essentially head-on confrontations between the life-tenured branch and the representative branches of government will not, in the long run, be beneficial to either. The public confidence essential to the former and the vitality critical to the latter may well erode if we do not exercise self-restraint in the utilization of our power to negative the actions of the other branches.” United States v. Richardson, 418 U.S. 166, 188, 94 S.Ct. 2940, 41 L.Ed.2d 678 (1974) (Powell, J., concurring).